839 A.2d 1038

**Carl R. GRADY and Diana Grady, his Wife, Appellees,**

**v.**

**FRITO–LAY, INC., a Foreign Corporation, Appellant.**

Supreme Court of Pennsylvania.

Argued March 4, 2003.

Decided Dec. 31, 2003.

548

John A. Robb, Morton G. Forbes, pro hac vice, for appellant, Frito–Lay, Inc., a foreign corporation.

Mary A. Wells, pro hac vice, James Michael Beck, for appellant, for amicus curiae Product Liability Advisory Council, Inc.

John P. Joyce, Pittsburgh, for appellee, Carl R. Grady, et al.

Before RALPH J. CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, and LAMB, JJ.

## *OPINION*

Chief Justice CAPPY.

In the present case, we consider whether the Superior Court correctly reversed the trial court's decision to exclude expert scientific evidence. We also consider whether to retain the rule announced in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), for determining whether such evidence is admissible. We conclude that *Frye* continues to provide the rule for decision in Pennsylvania. We also conclude that the Superior Court erred in reversing the trial court's ruling.

On April 5, 1995, Carl R. Grady ("Mr.Grady") and his wife, Diana Grady (collectively, "Appellees") commenced a lawsuit against the appellant, Frito–Lay, Inc. ("Frito–Lay"). In their

complaint, Appellees alleged that Mr. Grady ate several Doritos brand Tortilla Chips ("Doritos") that Frito–Lay designed, manufactured, and sold; that Mr. Grady felt as though chips had lodged in his throat; that Mr. Grady sought emergency hospital care; that medical procedures showed that Mr. Grady suffered an esophageal tear that resulted in serious physical injuries; and that the Doritos Mr. Grady had eaten caused the esophageal tear. Alleging further that Frito–Lay's Doritos are unsafe and defective because they fracture into hard, sharp fragments that are capable of lacerating the esophagus when eaten, Appellees set forth claims in negligence, strict liability, and breach of warranty.

When the pleadings closed, Frito–Lay filed Defendant's Motion for Summary Judgment, asserting that Appellees failed to produce evidence sufficient to satisfy their burden of proving that the Doritos had a defect; that the Doritos were improperly designed and manufactured; and that the Doritos caused Mr. Grady's esophagus to tear. Frito–Lay further alleged that expert testimony was necessary to prove each of these issues.

In their response to Frito–Lay's Motion for Summary Judgment, Appellees filed two expert reports. One of the reports (the "Beroes Report") was prepared by Charles Beroes, Ph.D., P.E., an associate professor emeritus of chemical engineering at the University of Pittsburgh. In his report, Dr. Beroes stated that Doritos possessed "several hidden-hazardous physical-strength and physical-shape properties" and described the tests he had performed on several types of Doritos, including Doritos that came from the bag of chips that Mr. Grady had eaten, to quantify these propensities. (Beroes Report at 2).

In one series of tests, Dr. Beroes measured the compressive strength of dry Doritos. In these tests, Dr. Beroes held a Dorito in his hand and pressed its triangular tip down on a platform gram balance that was covered with a pad until the chip snapped. He calculated the downward force needed to break each Dorito in grams, converted that force to pounds, and set forth "the average pressure that develop[ed] under the chip tips" and "the average breaking force [he had] applied to

the tips". (Beroes Report at 5, 7, 9). Dr. Beroes summarized this series of tests as establishing that "[l]arge pressures result when a few pounds of force are applied to the triangular shaped chips. The chip points were able to endure high pressures before fracturing. The sharp triangular chips can readily pierce the esophagus when driven into the walls of the esophagus by peristaltic action." (Beroes Report at 3).

In a second series of tests, Dr. Beroes measured the time it took saliva to soften Doritos. These tests were conducted in the same manner as the dry chip test, except that Dr. Beroes used Doritos that he had wetted with saliva by holding them in his mouth for 15 seconds, 30 seconds, 45 seconds, and 60 seconds. According to Dr. Beroes, these tests showed that "the tips of the triangular chips did not soften sufficiently to prevent laceration of the esophagus after 60 seconds of exposure of saliva. Each triangular chip fractures into smaller triangular chips with sharp tips. These tips resemble spears. Enormous pressures occur on these needle sharp tips which can lacerate almost any tissues in the digestive tract." (Beroes Report at 10.)

Based on his tests, Dr. Beroes concluded that the Doritos were dangerous and defective because they broke into smaller triangular chips that were too sharp, too thick, and too hard for safe passage in the esophagus. He also opined within a reasonable degree of scientific certainty that Frito–Lay failed to warn of the dangers of eating Doritos; that it failed to conduct the appropriate safety studies; that it failed to produce and sell Doritos with uniform compressive strength and hardness; that Doritos were not fit for safe consumption; that Doritos were negligently designed and manufactured; and that their uneven and dangerous characteristics caused Mr. Grady's esophageal tear and resulting injuries. (Beroes Report at 21–23).[1]

1. Appellees also filed an expert's report prepared by Augusto N. Delerme, M.D., F.A.C.S. in response to Frito–Lay's Motion for Summary Judgment. In his report, Dr. Delerme opined that the Doritos that Mr. Grady ate lacerated his esophagus on their passage to his stomach, and that the laceration caused Mr. Grady's injuries.

By order dated December 10, 1998, the trial court denied Frito–Lay's Motion for Summary Judgment.

In January 1999, the parties filed their respective pretrial statements. Appellees identified Dr. Beroes as an expert witness.

Thereafter, Frito–Lay filed a number of motions *in limine*. In three of these motions, Frito–Lay sought to exclude Dr. Beroes' testimony.[2] In a Motion to Preclude The Testimony Of Charles S. Beroes On The Issue Of Causation, Frito–Lay alleged that Dr. Beroes was not qualified by training or experience to testify as to the causal relationship between Mr. Grady's consumption of Doritos and his esophageal tear. In a Motion to Preclude Plaintiffs' Expert, Charles S. Beroes, From Testifying With Regard To The Ultimate Issues Of This Case, Frito–Lay alleged that Dr. Beroes' opinions with regard to ultimate issues were inadmissible because they were based on conflicting and unreliable evidence. And in a Motion To Preclude The Testimony of Plaintiffs' Expert, Charles S. Beroes, Frito–Lay alleged that Dr. Beroes' testimony regarding Doritos' physical characteristics was inadmissible because it did not meet the rule announced in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), which required Dr. Beroes to show that the method he used to test the Doritos was generally accepted in the relevant scientific community. Frito–Lay's latter two Motions incorporated, *inter alia*, the report of one of its experts, Martin R. Okos, a professor of biochemical and food processing at Purdue University. In his report, Dr. Okos questioned the validity of Dr. Beroes' tests and the accuracy of his results. Appellees did not counter Frito–Lay's assertion that Dr. Beroes' testimony failed to meet *Frye* or Dr. Okos'

**2.** Frito–Lay also filed a Motion *in limine* To Preclude The Testimony Of Plaintiff's Expert, Augusto N. Delerme, M.D., F.A.C.S. Frito–Lay alleged that Dr. Delerme, who specialized in otolaryngology, was not qualified to render an opinion on an esophageal tear and that Dr. Delerme's opinion was inadmissible because it was based on Dr. Beroes' inadmissible opinion. The trial court granted the Motion. *See Grady v. Frito–Lay*, 2000 WL 33436367 at *3 (Pa.Com.Pl. April 3, 2000). The Superior Court reversed the trial court's order. *Grady v. Frito–Lay*, 789 A.2d 735, 740–42 (Pa.Super.2001). Frito–Lay sought our review of the Superior Court's order in this regard. We did not grant review.

critical appraisal of Dr. Beroes' tests with evidence from Dr. Beroes or any other source.

On January 26, 1999, the trial court heard argument in chambers on all of the Motions *in Limine* that Frito–Lay had filed.[3] The trial court granted the Motions that raised the admissibility of Dr. Beroes' testimony, ruling that Dr. Beroes could not testify as to the tests he conducted on Doritos or give opinions about them.

Appellees then proffered the evidence they would submit to prove their case in view of all of the trial court's evidentiary rulings. In response, Frito–Lay moved for a compulsory non-suit. The trial court granted Frito–Lay's motion, concluding that Appellees would not be able to establish the elements of their claims.[4] Subsequently, Appellees filed a motion to remove the compulsory non-suit, which the trial court denied. Ultimately, judgment was entered in Frito–Lay's favor.

In a memorandum opinion that followed, the trial court explained its reasons for excluding Dr. Beroes' testimony. The trial court stated:

> It was the finding of this member of the Court, after taking into account the claimed expertise of the Plaintiffs' experts, and the methodology of Beroes, that Beroes' methodology was not based upon scientific data, or utilizing a methodology that was generally accepted in the community of scientists who evaluate food safety. Indeed, it was the impression of this member of the Court that Beroes' methodology smacked of a high school science fair project and did not

3. The procedure that the trial courts are to follow when a party files a motion to exclude expert testimony is presently set forth in Pa.R.C.P. 207.1. This Rule was adopted on January 22, 2001, and was effective as of July 1, 2001. Therefore, Rule 207.1 is not relevant to our discussion.

4. We observe that under the Pennsylvania Rules of Civil Procedure in effect at the time, the court was authorized to enter a compulsory non-suit at trial upon the oral motion of the defendant. *See* Pa.R.Civ.P. 230.1. Before trial, the court was authorized to grant a party's motion for summary judgment if an adverse party who bore the burden of proof at trial had failed to produce evidence of facts essential to his cause of action. *See* Pa.R.Civ. P. 1035.2(2). No issue was raised in this case as to the procedure that the trial court followed.

bear any relationship to the reality of the mastication and consumption of foodstuffs. Beroes approached the characteristics of the Dorito chips as if it were a static evaluation of a material, rather than a consumable. Accordingly, this member of the Court determined that Beroes' methodology was akin to "junk science," did not meet the test of [*Frye* ] and its progeny, and that Beroes' methodology and opinion would only mislead the jury. Beroes was otherwise unqualified to render an expert medical opinion as to whether the Doritos caused the husband-plaintiff's injury. The Defendant's motion *in limine* as to Beroes' opinion was, accordingly, granted.

*Grady v. Frito–Lay,* 2000 WL 33436367 at *2 (Pa.Com.Pl. April 3, 2000).

On appeal, the majority of the Superior Court *en banc* reversed the trial court's order granting Frito–Lay's Motions *in limine,* vacated the judgment of non-suit, and remanded for trial. *Grady v. Frito–Lay,* 789 A.2d 735 (Pa.Super.2001).

As to Dr. Beroes, the Superior Court concluded that he was competent to testify on the physical characteristics of Doritos; that his testimony satisfied the *Frye* test; that his compression strength calculations used standard principles that experts in the field can and have examined; and that any flaws in Dr. Beroes' testing design could be the subject of cross-examination at trial.[5] The Superior Court stated:

Nor do we find that the trial court properly precluded that part of the expert testimony of Dr. Beroes relating to the results of tests he had conducted on the Doritos chips, specifically, three series of compressive strength tests, and four sets of saliva tests conducted on whole chips. Rather, we are of the mind that Dr. Beroes was competent to testify as to the physical characteristics of the chips as revealed by

---

5. At the same time, however, the Superior Court held that the trial court's ruling as to "[t]hat portion of the expert testimony of Dr. Beroe's [sic] relating to the cause of Mr. Grady's esophageal tear was properly excluded as a chemical engineer is not competent or qualified to provide medical causation testimony." *Grady v. Frito–Lay, Inc.,* 789 A.2d at 742 n. 9 (citation omitted). This part of the Superior Court's decision and order is not before us.

the standard tests he had conducted upon the products of appellee.

The *Frye* test makes the admission of expert testimony dependent "upon the general acceptance of its validity by those scientists active in the field to which the evidence belongs."

\* \* \* \* \* \*

The process of consuming food involves both mechanical and chemical processes. The mechanical processes involve chewing and swallowing while the breaking down of the food involves chemical processes. Thus, an engineer such as Dr. Beroes is qualified to provide [an] expert opinion describing the composition and characteristics of the food product and the mechanics of the processes involved in chewing and swallowing. The series of tests conducted by Dr. Beroes did not involve any novel or new scientific principles, but rather crush strength and compression strength calculations which, as noted by appellants, are possibly "as old as the pyramids."

While appellee has provided valid criticisms of aspects of Dr. Beroes' tests, those criticisms do not attack the basic scientific principles involved in the tests conducted, but rather challenge such things as the use of a whole chip rather than the fragments yielded by chewing.

\* \* \* \* \* \* .

The tests, which employed standard calculations, can and have been readily examined and critically evaluated by experts in the field, including those retained by appellee. Such measurements are not "junk science", and any flaws in the design of the tests or compilation of the data can be readily critiqued by appellee.

*Id.* at 742–43 (footnote and citations omitted).[6]

This appeal followed, limited to whether the Superior Court correctly applied the law in reversing the trial court's decision

6. President Judge Del Sole filed a Concurring Statement that Judge Ford Elliot and Judge Orie Melvin joined. Judge Del Sole joined the majority opinion and stated that that when a pre-trial motion challeng-

to exclude Dr. Beroes' expert testimony on certain physical characteristics of Doritos.

We begin our discussion with the Rule 702 of the Pennsylvania Rules of Evidence. Rule 702 controls the admissibility of expert testimony on scientific knowledge, and states:

Rule 702. Testimony by experts

If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702.

The *Frye* test, first announced in *Frye v. United States*, 293 F. at 1013, and adopted in Pennsylvania in *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (Pa.1977), is part of Rule 702.[7] Under *Frye*, novel scientific evidence is admissible if the methodology that underlies the evidence has general acceptance in the relevant scientific community. *See Commonwealth v. Blasioli*, 552 Pa. 149, 713 A.2d 1117, 1119 (1998).[8]

ing an expert is filed, the movant must establish that the expert is not qualified to testify. *Id.* at 744.

Judge Joyce filed a Concurring and Dissenting Statement. Judge Joyce joined that part of the majority opinion that permitted Dr. Delerme's testimony and joined that part of then Judge Eakin's (now Justice Eakin's) dissent that would have affirmed the trial court's decision to exclude Dr. Beroes' testimony. *Id.*

Then Judge (now Justice) Eakin filed a Dissenting Opinion that Judge Stevens joined. He believed that Appellees failed to show that Dr. Beroes' testimony met the *Frye* test, and that the trial court properly exercised its discretion in finding that Dr. Delerme was not qualified to testify about the esophagus. Therefore, he would have affirmed the trial court's order in its entirety. *Id.* at 744-47.

7. When we adopted the Pennsylvania Rules of Evidence in 1998, we did not alter our prior decision in *Commonwealth v. Topa*, 369 A.2d at 1277, to use the *Frye* rule for determining the admissibility at trial of scientifically-adduced expert evidence. *See* 1998 Comment, Pa.R.E. 702.

8. The *Frye* test comes from the following passage in the *Frye* opinion:

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define.

For a time, the *Frye* rule guided a number of courts in deciding whether scientific evidence is admissible.[9] In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), however, the United States Supreme Court rejected *Frye*. The Court determined that *Frye's* "general acceptance" rule had been superceded by adoption of the Federal Rules of Evidence, and reasoned that it was no longer consistent with the federal law's liberal thrust. *Id.* at 588, 113 S.Ct. 2786. Accordingly, the Court announced a different test for the federal courts to use when deciding whether to admit scientific evidence. Under *Daubert*, the trial judge evaluates whether the evidence will assist the trier of fact, and whether the evidence is reliable and scientifically valid. *Id.* at 592, 113 S.Ct. 2786. Moreover, *Frye's* criteria of general acceptance is not required, but is only one factor, among several, that the court may assess in determining whether to admit the scientific testimony. *Id.* at 594, 113 S.Ct. 2786.

After *Daubert* was decided, a number of state courts adopted the *Daubert* standard.[10] We, however, have continued to follow *Frye*. In granting allocatur to review the Superior Court's present decision, we determined that it provided us with the opportunity to assess our continued adherence to *Frye*. Accordingly, we directed the parties to address the effect of the *Frye* and *Daubert* cases on the issue we are deciding. In their respective briefs, both Appellees and Frito–Lay indicated a preference for *Frye* and neither of them urged us to move to *Daubert*.[11]

> Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, *the thing from which the deduction is made must be sufficiently established to have gained general* acceptance in the particular field in which it belongs.
> *Frye*, 293 F. at 1014 (emphasis added).

9. *See generally* JANE CAMPBELL MORIARTY, 1 PSYCHOLOGICAL AND SCIENTIFIC EVIDENCE IN CRIMINAL TRIALS § 10:26 and the cases discussed therein.

10. *Id.* at § 10.42 and the cases discussed therein.

11. Frito–Lay asserted that the *Frye* test is more consistent with Pennsylvania practice, more objective and easier to apply, than is the *Daubert*

After careful consideration, we conclude that the *Frye* rule will continue to be applied in Pennsylvania. In our view, *Frye's* "general acceptance" test is a proven and workable rule, which when faithfully followed, fairly serves its purpose of assisting the courts in determining when scientific evidence is reliable and should be admitted.

One of the primary reasons we embraced the *Frye* test in *Topa* was its assurance that judges would be guided by scientists when assessing the reliability of a scientific method. *See Topa*, 369 A.2d at 1281 (*quoting United States v. Addison*, 498 F.2d 741, 744 (D.C.Cir.1974)). Given the ever-increasing complexity of scientific advances, this assurance is at least as compelling today as it was in 1977, when we decided that case. We believe now, as we did then, that requiring judges to pay deference to the conclusions of those who are in the best position to evaluate the merits of scientific theory and technique when ruling on the admissibility of scientific proof, as the *Frye* rule requires, is the better way of insuring that only reliable expert scientific evidence is admitted at trial.

We also believe that the *Frye* test, which is premised on a rule—that of "general acceptance"—is more likely to yield uniform, objective, and predictable results among the courts, than is the application of the *Daubert* standard, which calls for a balancing of several factors. Moreover, the decisions of individual judges, whose backgrounds in science may vary widely, will be similarly guided by the consensus that exists in the scientific community on such matters.

Thus, as we are persuaded of the wisdom and efficacy of *Frye's* "general acceptance" rule, we hold that it continues to control in Pennsylvania.[12]

standard. (Appellant's Brief at 24–27). Appellees asserted that Pa.R.E. 702, which codifies the *Frye* rule, is effective. (Appellees' Brief at 17–21). The Product Liability Council, Inc. in its Brief of *Amicus Curiae* In Support of Appellant also voiced its support for the *Frye* rule.

**12.** Our reasons for adhering to the *Frye* rule are among the reasons that other courts have given for their respective views that the rule is sensible and effective. *See e.g., People v. Kelly*, 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240, 1244–45 (1976); *Stokes v. State*, 548 So.2d 188, 193–94 (Fla.1989); *State v. Copeland*, 130 Wash.2d 244, 922

■ We now turn to the importance of *Frye's* proper application, and make the following points. First, consistent with our traditional adherence to the general evidentiary tenet that the proponent of a proposition bears the burden of proving it, *see In re Johnson,* 509 Pa. 347, 502 A.2d 142, 146 (1985), and the principle that is evident in this type of case, *see, e.g., Topa* 369 A.2d at 1277 and *Commonwealth v. Zook,* 532 Pa. 79, 615 A.2d 1 (1992), *cert. denied,* 507 U.S. 974, 113 S.Ct. 1420, 122 L.Ed.2d 789 (1993), we emphasize that the proponent of expert scientific evidence bears the burden of establishing all of the elements for its admission under Pa. R.E. 702, which includes showing that the *Frye* rule is satisfied.

■ Second, in applying the *Frye* rule, we have required and continue to require that the proponent of the evidence prove that the methodology an expert used is generally accepted by scientists in the relevant field as a method for arriving at the conclusion the expert will testify to at trial. *See, e.g., Blasioli,* 713 A.2d at 1119.

This does not mean, however, that the proponent must prove that the scientific community has also generally accepted the expert's conclusion.[13] We have never required and do not require such a showing. This, in our view, is the sensible approach, for it imposes appropriate restrictions on the admission of scientific evidence, without stifling creativity and innovative thought.

■ Third, under Pa.R.E. 702, the *Frye* requirement is one of several criteria. By its terms, the Rule also mandates, *inter alia,* that scientific testimony be given by "a witness who is qualified as an expert by knowledge, skill, experience, training or education...." Pa.R.E. 702. Whether a witness is qualified to render opinions and whether his testimony passes the *Frye* test are two distinct inquiries that must be raised

P.2d 1304, 1312–1315 (1996); *Goeb v. Tharaldson,* 615 N.W.2d 800, 812–814 (Minn.2000).

**13.** To the extent that any decisions are to the contrary, they are wrongly decided. *See, e.g., McKenzie v. Westinghouse Electric Co.,* 674 A.2d 1167 (Pa.Cmwlth.1996).

and developed separately by the parties, and ruled upon separately by the trial courts. *See Commonwealth v. Arroyo*, 555 Pa. 125, 723 A.2d 162, 170 (1999).[14]

■ Fourth and finally, as to the standard of appellate review that applies to the *Frye* issue, we have stated that the admission of expert scientific testimony is an evidentiary matter for the trial court's discretion and should not be disturbed on appeal unless the trial court abuses its discretion. *See Commonwealth v. Zook*, 615 A.2d at 11. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. *Paden v. Baker Concrete Constr., Inc.*, 540 Pa. 409, 658 A.2d 341, 343 (1995).

■ It now remains to apply these principles to the present case. As a preliminary matter, Frito–Lay takes issue with the Superior Court's application of the standard of review. Frito–Lay argues that the Superior Court did not determine whether the trial court abused its discretion in excluding Dr. Beroes' testimony under *Frye*. Rather, the Superior Court essentially ignored the trial court's ruling and substituted its judgment for that of the trial court.

We agree. As abuse of discretion is the standard of review in this matter, it was the Superior Court's function to determine whether the trial court's decision to exclude Dr. Beroes' testimony under *Frye* constituted unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. *See id.* Nowhere in its opinion, however, did the Superior Court undertake this function.

14. We make this observation because we are unable to discern from the record and the lower courts' respective opinions whether the trial court or the Superior Court made a decision on whether Dr. Beroes was qualified under Pa.R.E. 702 to testify as an expert on Doritos' physical properties in these circumstances. Each court made statements that suggested that it was ruling upon Dr. Beroes' qualifications in this regard, but those statements were inextricably intertwined with analysis of the *Frye* question. In light of our disposition of the *Frye* issue in this appeal, we need not address this matter.

Instead, it looked directly at Dr. Beroes' testimony, decided what it thought of it, and reversed the trial court because it assessed the testimony differently. Thus, we conclude that the Superior Court erred.

At this point in these proceedings, we believe that the interests of judicial economy will be best served if we apply the proper standard of review to the trial court's ruling, rather than remanding this case to the Superior Court to do so. *See Danville Area School Dist. v. Danville Area Educ. Ass'n, PSEA/NEA,* 562 Pa. 238, 754 A.2d 1255, 1262 (2000). Therefore, we will consider whether the trial court abused its discretion when it decided to exclude Dr. Beroes' testimony because it did not satisfy *Frye*.

In reaching its decision, the trial court viewed Dr. Beroes' testimony, and hence his tests, as aimed at evaluating certain physical characteristics of Doritos while in the process of being chewed and swallowed. Based on this perspective, the trial court concluded that Dr. Beroes' testimony was inadmissible because it was not shown that the means he used to evaluate those characteristics was generally accepted by scientists who evaluate food safety. *See supra* 1042.

Appellees argue that the trial court's determination cannot stand because the trial court failed to understand that Dr. Beroes measured the crush strength of Doritos by applying the standard calculations that any scientist would use to test the crush strength of a material. Frito–Lay asserts that Appellees' exclusive focus on the allegedly standard nature of the calculations Dr. Beroes used in his tests is beside the point, insofar as it fails to account for the fact that Dr. Beroes' conclusions went to the hardness and shape of Doritos as they are eaten, not their physical condition in a vacuum.

We agree with Frito–Lay that Appellees' argument regarding Dr. Beroes' methodology misses the mark, in light of the conclusion about Doritos that Dr. Beroes was going to present to the jury at trial. That conclusion was not, as Appellees' position implies, the average downward force that it takes to break various types of Doritos. Rather, it was that Doritos

remain too hard and too sharp when being chewed and swallowed for safe eating. While Dr. Beroes' calculations may in fact represent a standard method that scientists use to reach a conclusion about the downward force needed to break Doritos, they are not also *necessarily* a generally accepted method that scientists in the relevant field (or fields) use for reaching a conclusion as to whether Doritos remain too hard and too sharp as they are chewed and swallowed to be eaten safely. It was, therefore, incumbent upon Appellees to prove that scientists in the relevant field (or fields) generally accept Dr. Beroes' methodology as a means for arriving at such a conclusion. Appellees, however, filed no evidence whatsoever in this regard. Thus, Appellees failed to satisfy their burden of proving that Dr. Beroes' evidence met the *Frye* rule. Accordingly, we conclude that the trial court did not abuse its discretion in deciding that Dr. Beroes' testimony was inadmissible, and hold that the Superior Court erred in reversing the trial court's ruling.[15]

In summary, we reaffirm our adherence to the *Frye* rule; clarify that the rule applies to an expert's methods, not his conclusions; emphasize that the proponent of the expert scientific evidence bears the burden of proof on the *Frye* issue; and reiterate that the standard of appellate review on the *Frye* issue is the abuse of discretion standard.

For all the foregoing reasons, we reverse that part of the Superior Court's order that reversed the trial court's order granting Frito–Lay's Motions *in limine* as to Dr. Beroes' testimony on the physical characteristics of Doritos, and remand this case to the trial court for proceedings consistent with this opinion.

15. We observe that in its opinion, the trial court did not only conclude that Appellees failed to show that Dr. Beroes' evidence satisfied the *Frye* rule. The trial court also affirmatively concluded that Dr. Beroes' methodology is "junk science" and essentially, not generally accepted by scientists in the relevant field. The record does not support this conclusion. Frito–Lay did not prove that Dr. Beroes' method is not generally accepted by scientists in the relevant field, nor was it required to do so. As we point out, it was Appellees' burden to prove that *Frye* was satisfied, not Frito–Lay's burden to prove otherwise.

Justice EAKIN did not participate in the consideration or decision of this case.

Justice CASTILLE files a concurring opinion.

Justice NEWMAN files a concurring opinion.

Justice SAYLOR files a concurring opinion.

Justice LAMB files a concurring opinion.

Justice CASTILLE, concurring.

Because the Majority Opinion is consistent with the position I outlined in my dissenting opinion in *Blum v. Merrell Dow Pharmaceuticals,* 564 Pa. 3, 764 A.2d 1 (2000), I join.

In that dissenting opinion, I made three basic points. First, I noted that the test set forth in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), and adopted by this Court in *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277, 1281 (1977), "should remain the general evidentiary standard for admitting expert scientific testimony in this Commonwealth." *Blum,* 764 A.2d at 6 (Castille, J. dissenting). Second, I noted that I would have explicitly disapproved of the Commonwealth Court's novel opinion in *McKenzie v. Westinghouse Electric Co.,* 674 A.2d 1167 (Pa.Cmwlth.1996), *allocatur denied,* 547 Pa. 733, 689 A.2d 237 (1997), which "would require that a scientific expert's opinion as to the **causal relationship** at issue, and not just the expert's methodology, must find general acceptance in the relevant scientific community before it may even be heard." *Id.* at 7, 9, 764 A.2d 1 (emphasis original). In my view, the general acceptance test is confined to the methodology at issue. Today's Majority Opinion embraces both of these points.

The third point was that proper application of the *Frye* "general acceptance" test may require some flexibility in examining the relevant scientific community and the legitimacy of the scientific "consensus" which is invoked in an attempt to exclude the minority views of otherwise-qualified experts. As was readily demonstrated in *Blum,* there is a need for a limited exception to the *Frye* rule when, as in a case such as

*Blum,* there was evidence to show that the scientific orthodoxy that was invoked to exclude minority views was "a result of proprietary research influenced by an interested party." My Dissenting Opinion elaborated upon that concern as follows:

> [T]he record here shows that [the defendant drug manufacturer] largely created the "generally accepted orthodoxy" that would freeze out viewpoints contrary to [its] litigation interests. [The manufacturer] subsidized or otherwise influenced most of the studies that concluded that [its drug] does not cause birth defects. [The manufacturer's] role in virtually creating, and then slanting, the "scientific community" should be a relevant factor in the *Frye* analysis. Accordingly, I would create a limited exception to *Frye* that would permit the introduction of expert opinions contrary to those opinions generally held by the "scientific community," when those opinions are a result of proprietary research influenced by an interested party.
>
> There is something not a little offensive about an entity creating a biased, litigation-driven scientific "orthodoxy," and then being permitted to silence any qualified expert holding a dissenting view on grounds of "unorthodoxy." Where the would-be relevant scientific community is a community beholden to the defendants' litigation interests, that biased community should not be permitted to squelch dissenting opposing opinions. The trial court here properly refused to allow that unjust result to occur.

*Id.* at 16–17, 764 A.2d 1. The brief Majority Opinion in *Blum* entirely failed to address this concern, notwithstanding its prominent role in the reasoning of the *Blum* trial judge.

The Court today understandably does not discuss this proprietary interest scenario because it is not at issue. I write on the point only to note that I continue to believe what I expressed in *Blum* and that nothing in today's Majority Opinion operates to preclude the analysis set forth in my Dissent in the next case properly presenting the issue.

Subject to the above qualification, I join the Majority Opinion.

Justice NEWMAN, concurring.

While I agree with the majority's determination that the trial court properly excluded the testimony of Dr. Beroes, I cannot agree with its conclusion that the standard announced in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), rather than the balancing test articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), should control the admissibility of scientific expert testimony in this Commonwealth.

The *Frye* standard has as its genesis the following language from the 1923 Opinion of the United States Court of Appeals for the District of Columbia Circuit:

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be **sufficiently established** to have gained **general acceptance** in the particular field in which it belongs.

*Frye,* 293 F. at 1014 (emphasis added). *Frye* provided universal governance of the admissibility of expert testimony until Congress adopted the Federal Rules of Evidence. Rule 702, entering the fray in July of 1973, originally provided as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

F.R.E. 702 (West 1993).

In 1993, the United States Supreme Court determined that Rule 702 superseded *Frye,* concluding that the text of the rule

does not require that the scientific principle or discovery has gained "general acceptance." The Court reasoned that because the drafters of Rule 702 did not mention *Frye*, "and a rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules[,] . . . the assertion that the Rules somehow assimilated *Frye* is unconvincing." *Daubert*, 509 U.S. at 588–589, 113 S.Ct. 2786. The Court held that *Frye's* exclusive "general acceptance" test was an "austere standard, **absent from, and incompatible with,** the Federal Rules of Evidence, [and] should not be applied in federal trials." *Id.* at 589, 113 S.Ct. 2786 (emphasis added).

Recognizing the potential for courts to use *Daubert* to buck uniform application of the law, the Court clarified the parameters of Rule 702. "Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. 2786. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–593, 113 S.Ct. 2786. The Court explained that many factors could bear on these questions, but articulated the following four "general observations" that consistently have been viewed as the primary principles governing the admissibility of expert testimony:

(1) "Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry."

(2) "Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability, and in some instances well-

grounded but innovative theories will not have been published. Some propositions, moreover, are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected."

(3) "Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation."

(4) "Finally, 'general acceptance' can yet have a bearing on the inquiry. A reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community. Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism."

*Id.* at 593–594, 113 S.Ct. 2786 (internal citations and quotations omitted).

This Court adopted the Pennsylvania Rules of Evidence on May 8, 1998, and determined that they would be effective as of October 1st of that year. Pennsylvania Rule of Evidence 702 provides as follows:

If scientific, technical or other specialized knowledge *beyond that possessed by a layperson* will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702 (emphasis added). As noted in the Comment to Rule 702, the phrase emphasized above, "beyond that possessed by a layperson," is the only difference between the Federal Rule and our version. This proviso was added to ensure that Rule 702 did not vary the common law rule

announced in *Commonwealth v. Dunkle*, 529 Pa. 168, 602 A.2d 830 (1992), that "[e]xpert testimony is admitted to aid a jury when the subject matter of the testimony is related to a science, skill or occupation beyond the knowledge or experience of the average layperson." *Id.* at 843 n. 3. Regarding the *Frye/Daubert* conflict, this Court explained that:

Adoption of Pa.R.E. 702 does not alter Pennsylvania's adoption of the standard in [*Frye* ], which requires scientific evidence to have "general acceptance" in the relevant scientific community. *See Commonwealth v. Dunkle, supra; Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981); *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977). In 1993, the United States Supreme Court held that *Frye* was superseded in the federal courts by the adoption of F.R.E. 702. [*Daubert* ]. Pennsylvania courts have not yet decided whether the rationale in *Daubert* supersedes or modifies the *Frye* test in Pennsylvania. *Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395 (1994).

Comment to Rule 702.

In *Crews*, decided a year after the Supreme Court of the United States issued its decision in *Daubert*, we applied *Frye*, but refused to address whether *Daubert* supersedes or modifies *Frye*, noting that *Daubert* interpreted F.R.E. 702 and that the trial and appellate argument in *Crews* was complete prior to the ruling in *Daubert*. *Crews*, 640 A.2d at 400 n. 2. In *Blum v. Merrell Dow Pharmaceuticals, Inc.*, 564 Pa. 3, 764 A.2d 1 (2000), we granted allocatur "to consider whether the *Frye* rule still governs the admissibility of expert scientific testimony in Pennsylvania or whether the *Daubert* rule has superseded it." *Blum*, 764 A.2d at 2 (internal footnotes omitted). We explained the difference between the two tests as follows:

*Frye* requires the scientific community to reach some consensus as to reliability then relies on such consensus to determine the admissibility of the challenged scientific evidence. *Daubert*, on the other hand, examining the same factors which lead to general acceptance in the scientific community, abandons the standard of "general acceptance"

and substitutes a judicial evaluation and determination of scientific reliability.

*Blum,* 764 A.2d at 3. However, because we determined that the expert testimony was flawed and unreliable, we concluded that the evidence would have been inadmissible under either standard and, accordingly, concluded that "a choice between the two standards [was] unnecessary to the resolution of [the] appeal." *Id.* at 4, 764 A.2d 1. Therefore, our prior decisions in this arena do not constrain our consideration of whether to adopt *Daubert* or retain *Frye.*

Pa.R.E. 702 was modeled after F.R.E. 702 and uses the exact same language, with the exception of the addition of the phrase "beyond that possessed by a layperson" to the Pennsylvania version. This additional phrase, however, has no bearing on the ultimate issue *sub judice*—whether scientific knowledge about which an expert wishes to testify must have gained general acceptance. Therefore, as the Pennsylvania Rules of Evidence were modeled after the Federal Rules of Evidence, *see* Preface to the Pennsylvania Rules of Evidence, and the language employed by both F.R.E. 702 and Pa.R.E. 702 is effectively identical, I cannot affix my name to any decision that fails to give appropriate deference to an interpretation of identical language forwarded by the United States Supreme Court. That tribunal, in interpreting F.R.E. 702, expressly stated that *Frye* was an "austere standard, absent from, and **incompatible with,** the Federal Rules of Evidence." *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786 (emphasis added). While I recognize that the Federal Rules of Evidence may have a more "liberal thrust" in terms of admitting evidence, if *Frye* is "absent from ... and incompatible with" F.R.E. 702, I fail to see how *Frye* could fit within the parameters of Pa.R.E. 702.

Moreover, the *Daubert* rule properly retracts from the antiquated notions of *Frye* and recognizes that new scientific methods and theories could be of benefit while still ensuring that the evidence sought to be considered is supported by sufficient indicia of reliability. The *Daubert* Court cited approvingly to several *amicus* briefs, which indicated that "sci-

entists do not assert that they know what is immutably 'true'—they are committed to searching for new, temporary, theories to explain, as best they can, phenomena." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. An additional *amicus* brief stated that [s]cience is not an encyclopedic body of knowledge about the universe. Instead, it represents a **process** for proposing and refining theoretical explanations about the world that are subject to further testing and refinement. *Id.* (emphasis in original). But, in order to qualify as scientific knowledge, an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., good grounds, based on what is known. In short, the requirement that an expert's testimony pertain to scientific knowledge establishes a standard of evidentiary reliability. *Id.* With these safeguards in place, I believe that we must loosen the standards for the introduction of scientific evidence—otherwise we would have had to reject Galileo and Newton in their times. Accordingly, I believe that *Daubert* should control in this Commonwealth.[1]

Ultimately, however, I must concur in the result reached by the majority because I do not believe that the compression strength and crush strength studies sought to be introduced by Dr. Beroes constitute "scientific, technical or other specialized knowledge [that] will assist the trier of fact." Pa.R.E. 702. *Daubert* requires weighing the following factors: (1) whether or not the technique or methodology can be or has been tested; (2) whether the technique or methodology has been subjected to peer review and publication; (3) known or potential rate of error; and (4) the existence and maintenance of standards controlling the technique's operation. However, we need not consider these factors, because the technique the Gradys sought to introduce, crushing nacho chips with one's finger and a Styrofoam block, could not assist a jury in

---

1. The majority notes that all of the parties and *amicus curiae* in this case advocated for the retention of *Frye*. Our responsibility in this case, however, is to determine the proper standard of admissibility for the entire Commonwealth, and we should not limit our consideration merely because those involved in this case agree on the applicable standard.

determining any fact in issue. As noted by Judge Eakin (now, Mr. Justice Eakin) in his dissent in the Superior Court, these tests wholly fail to account for the processes of mastication. How fast and effectively a person chews, the characteristics of teeth used, how teeth differ from a finger and a Styrofoam block, and how saliva would break down the chip are important questions that Dr. Beroes fails to consider. By not recognizing these inherent limitations in the methods of Dr. Beroes, the Gradys have not presented reliable evidence regarding the effect the nacho chips in question could have had on the esophagus of Carl R. Grady. Thus, albeit based on different grounds, I must concur with my colleagues that the trial court did not err in excluding the testimony of Dr. Beroes.

Justice SAYLOR, concurring.

Concerning the *Frye/Daubert* debate, I take the position that the *Frye* rule is and remains the law of the Commonwealth, unless and until informed advocacy is presented that would favor a new direction, with due reference to the substantial body of information that has developed concerning the experience of the federal courts and others under *Daubert*.

With regard to the substantive analysis under *Frye*, I am not certain that I would frame the relevant inquiry as narrowly as does the majority. *See* Majority Opinion, *Op.* at 1047 (stating the controlling question as whether Dr. Beroes' calculations are "a generally accepted method that scientists in the relevant field (or fields) use for reaching a conclusion as to whether Doritos remain too hard and too sharp as they are chewed and swallowed to be eaten safely."). Indeed, taken to an extreme, such a formulation could be read to suggest that a plaintiff in these circumstances would need to identify a scientific community centered on Doritos chewing. In the abstract, I see no reason why properly grounded and confined opinions of a chemical engineer could not be offered in conjunction with the opinion of a physician in a case predicated on

non-obvious and undisclosed propensities arising from the compressive strength of foodstuff.[1]

Here, however, as reflected in the trial court's determination, Dr. Beroes' opinions were neither properly grounded nor confined. In the first instance, in his report, he attempted to incorporate physiological principles (for example, the makeup and functioning of the esophagus) in order to speak directly to the ultimate issues in the case and, thus, offered opinions beyond the range of his expertise. Concerning the portion of his report centered on the physical properties of Doritos, I believe that a plaintiff who is going to rely on a relatively uncontrolled study involving a single researcher placing chips in his mouth with only a measure of time to reflect the degree of exposure to saliva, and with no attempt to account for other relevant factors such as the effect of mastication, is going to have a difficult time convincing a court that such methodology is accepted by any category of scientists as appropriate to establish a conclusion to a reasonable degree of scientific certainty.

Therefore, I am more in line with the trial court's conclusion that Dr. Beroes' methodology represented faulty science, thus lacking in general acceptance, although I fully acknowledge that there is a dynamic to his assessment that comports with the common sense notion that it is necessary to properly chew hard foodstuffs prior to swallowing.

Thus, I concur in the result.

Justice LAMB, concurring.

I join the majority but write separately, first, to express my agreement with Mr. Justice Castille that flexibility in the application of the *Frye* standard is required, particularly in those instances where scientific consensus is the product of proprietary research. Additionally, in my view, the dichotomy

1. Notably, Appellees sought to offer expert testimony from a physician, which the Superior Court determined should not have been excluded by the trial court under the *Frye* test; as the majority notes, such determination has not been included within the scope of this Court's discretionary review.

suggested by the majority between general acceptance of methods and general acceptance of conclusions will often prove to be, as it was in this instance, less helpful in practice than the clarity of its exposition would suggest.

The majority, in discussing the proper application of the *Frye* standard, states that "the proponent of the evidence [must] prove that the methodology an expert used is generally accepted by scientists in the relevant field as a method for arriving at the conclusion the expert will testify to at trial." Majority Op. at 1045. In the next sentences, the majority cautions that "[t]his does not mean, however, that the proponent must prove that the scientific community has also generally accepted the expert's conclusion" and generalizes that "[w]e have never required and do not require such a showing." *Id.* at 1045.

Thus, in the majority's view, consensus as to the expert witness's conclusion is not required for admissibility but the proponent of that conclusion must establish consensus that the witness's method is appropriate "for arriving at the conclusion ..." *Id.* In this case, the majority concedes that the methods employed by the witness were, in fact, unobjectionable in themselves.[1] However, the evidence was properly excluded under *Frye* because these methods were not shown to be "the accepted methods ... for reaching a conclusion as to whether Doritos remain too hard and too sharp as they are chewed and swallowed to be eaten safely." Majority Op. at 1047.

It is clear from the majority's discussion that evidentiary admissibility under *Frye* requires evidence of a scientific consensus the nature of which encompasses elements of the proffered conclusion as well as of the method used to reach that conclusion. As so understood, I am in agreement with this analysis. Similarly, in *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), a city electrician with lung cancer brought suit against the manufacturers

1. A portion of the Superior Court's opinion is excerpted for this purpose in which the methods employed by the plaintiffs' witness are described as, possibly, "as old as the pyramids" and involving no "novel or new scientific principles...." Majority slip op. at 7.

of the toxic substances (including polychlorinated biphenyls—PCB's) he alleged were instrumental in causing or promoting his illness. Epidemiological studies as well as those involving animal models were offered by the electrician in resisting the manufacturer defendant's motion for summary judgment but the trial court held this evidence to be inadmissible. The United States Supreme Court agreed with this ruling, notwithstanding general scientific acceptance of the methods employed by the plaintiff's expert witnesses and the plaintiff's reliance on the statement in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), that the "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." The Court reasoned in *Joiner* that "conclusions and methodology are not entirely distinct from one another." 522 U.S. at 146, 118 S.Ct. 512.

With the caveat that conclusions and methodology are not entirely distinct from one another, I am in agreement with the majority's analysis in this case. Indeed, while a full explanation of the reasons are beyond the present necessities, I submit that in the usual case, consensus by the relevant scientific community that a particular methodology is appropriately employed to reach a particular conclusion, will also imply a consensus as to the conclusion itself. This relationship between methodological consensus and agreement with the result thereby obtained is a function of characteristics of the scientific method itself including the essential traits of objectivity, operationalism,[2] verifiability[3] and replicability.[4]

2. Operationalism is the philosophical doctrine underlying the scientific method that the meaning of a proposition consists of the operations involved in proving or applying it.

3. Verifiability refers to susceptibility of a proposition to being tested (verified or falsified) by experiment or observation. A scientific proposition cannot be true (or meaningful) unless it is verifiable.

4. Replicability refers to the ability of different scientists using the same methods of observation or experimentation to achieve the same results. As applied to scientific propositions, it is the state or property of being experimentally replicable. A scientific hypothesis cannot be confirmed unless the methods of confirmation can be replicated.