**Snizavich v. Dow Chemical Co.**

*Aaron Freiwald,* for plaintiff.
*Julie Randolph,* for defendant.

DIVITO, *J.*, November 19, 2012—This is based upon an appeal by Anne Snizavich ("plaintiff"), individually and as the administrator of the estate of Joseph Snizavich ("decedent") from the court's order entered on April 17,

2012 granting Dow Chemical Company and Rohm and Haas Company's ("defendants") motion to preclude the testimony of Thomas H. Milby. For the reasons that follow, the order by the court granting the motion should be affirmed as well as the subsequent order granting the defendants' motion for summary judgment.

## I. Background

Plaintiff in her complaint alleged that her husband Joseph Snizavich, who died on September 19, 2008 as a result of Glioblastoma Multiforme brain cancer, developed cancer as a result of chemicals that the decedent was exposed to during the time that he worked at defendants' facilities in Spring House, Pennsylvania. The decedent was not an employee of the defendants, but rather was employed by an outside contractor, the Welsch Company, to perform HVAC work at the Spring House location. Plaintiff alleges that the decedent worked at the Spring House location for approximately 13 years between 1980 to 1993.

In support of the plaintiff's allegations that the decedent's cancer was a result of exposure to chemicals at the Spring House facility, she submitted a report ("Milby Report") written by Thomas Milby, M.D. ("Milby") stating that it was his opinion that chemicals produced by Rohm and Haas at the Spring House location were the cause of the Glioblastoma Multiforme cancer. Milby identified three events which he considered "crucial" in coming to his opinion, 1) the decedent worked at the Spring House facility for 13 years during which time he

was exposed to various chemicals, none of which were named or discussed in the report; 2) the decedent died of a brain cancer that accounts for approximately 2.4% of cancer deaths in the United States; 3) a University of Minnesota School of Public Health report ("University of Minnesota Report") showed that there was a higher than average incidence of brain cancer deaths among Spring House facility employees but that no clear link existed between the chemicals used at Spring House and the higher incidence of brain cancer.[1]

In response to the Milby Report, defendants filed a motion to preclude the testimony of Thomas H. Milby. The motion was granted by the court on the grounds that the report was wholly inadequate under Pennsylvania law as failing to provide a "reasonable degree of medical certainty" and that any sort of Frye analysis of its methodology would be futile as none apparently existed within the report. Further, as the plaintiff had shown no evidence or expert testimony causally linking the defendants to the decedent's illness and death, the motion of the defendants for summary judgment was granted. The plaintiff now appeals those rulings.

## II. Plaintiff's Matters Complained of on Appeal

The plaintiff in her statement of errors complained of on appeal lists several points of contention, however, they can be summed up as stating that the court erroneously

---

1. Milby frequently referenced the University of Minnesota School of Public Health Report but did not cite it. Its full citation is: C. Baase, et al, "A report on the Mortality Experience of the Spring House Research Facility in Montgomery County, Pennsylvania" (October 25, 2010).

precluded the Milby Report and testimony, did not conduct a full Frye analysis, and, subsequently, granted the defendants' motion for summary judgment.

Whether expert testimony regarding scientific knowledge should be admissible is controlled by Pennsylvania Rule of Evidence 702, which states:

If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise. Pa.R.E. 702

The Frye analysis, first formulated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and adopted by *Pennsylvania in Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977), is considered to be a part of Rule 702. The Pennsylvania Supreme court has stated that, "Under Frye, novel scientific evidence is admissible if the methodology that underlies evidence has general acceptance in the relevant scientific community." *Grady v. Frito-Lay, Inc.*, 576 Pa. 546, 555, 839 A.2d 1038, 1044 (2003). Hence, for a Frye analysis to be performed there must be some type of underlying methodology for a court to be able to analyze.

In applying a Frye analysis the Pennsylvania Supreme court stated four points that a court should consider. First, "the proponent of a proposition bears the burden of

proving it [and] we emphasize that the proponent of expert scientific evidence bears the burden of establishing all of the elements for its admission under Pa.R.E. 702." *Grady*, 576 Pa. at 558, 839 A.2d at 1045. Secondly, the proponent is required to "prove that the methodology an expert used is generally accepted by scientists in the relevant field as a method for arriving at the conclusion the expert will testify to at trial." *Id.* Third, under Pa.R.E. The Frye requirement is only one of several criteria, including the expertise of the witness presenting the scientific evidence. *Id.* at 1045-46. Finally, the court reiterated:

> [T]he admission of expert scientific testimony is an evidentiary matter for the trial court's discretion and should not be disturbed on appeal unless the trial court abuses its discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. *Id.* at 1046 (Internal Citations Omitted).

The rules in granting summary judgment are well known and based upon Pa.R.C.P. 1035.2. It finds that, "where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment." *ADP, Inc. v. Morrow Motors Inc.*, 969 A.2d 1244, 1246 (Pa. Super. 2009). Furthermore, "failure of

a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law." *Id.*

Based on the foregoing, it was not necessary to conduct a full Frye analysis on the report issued by Milby, as it failed both of the basic requirements of showing a coherent scientific or technical methodology to which any type of analysis could be applied as to its acceptance in the scientific community or showing that its conclusions would in any way assist the trier of fact to understand the evidence or a fact in issue. The report is nothing more than conclusions, without any apparent basis in scientific studies or research, being supported by large leaps in logic and anecdotal evidence of other individuals who worked at the Spring House facility having died of brain cancer. In stating his conclusion, Milby states that he reviewed four depositions, the University of Minnesota Report, a schematic of the Spring House facility, a list of chemicals identified as possibly causing brain cancer, the decedent's pathology report, and records of the Steamfitter's Union.

The depositions provide no basis for a medical or scientific conclusion. Two are never referenced at all in the report, one is merely the decedent's Welsch supervisor providing information of the decedent's work schedule and duties, and the final is that of a chemist, Ledelle Collier, that worked at the facility. While the chemist does state that there were organic chemicals in the air and that these chemicals were at times recirculated in the air, the Milby

Report fails to identify a single one of these chemicals and what effect, if any, these chemicals could have on the development of Glioblastoma Multiforme cancer. The chemist also referenced testing and studies of the air done by Rohm and Haas in approximately 1982, but the Milby Report does not mention that Milby ever actually read or investigated any of those alleged reports or based any conclusions on them.

Most troubling, however, is Milby's alleged reliance on the University of Minnesota Report, which was the sole source of scientific analysis that Milby reviewed in coming to his opinion. Though Milby correctly states that the report found that there is a statistically higher occurrence of brain cancer amongst individuals that worked at the Spring House facility, and that possibly thousands of chemicals have been used at the Spring House facility, the Milby Report completely glosses over the conclusions of the University of Minnesota Report. It's conclusions are worth citing and it states, in part:

> Several chemicals of interest were part of this investigation and included acrylates, BCME, CMME, isothiazolones and nitrosoamines. Based on the approach used to categorize exposures to these materials, these chemicals did not appear to be related to the brain cancers. Similarly, working with these materials was not associated with the apparent brain cancer excess. Although this excess was not clearly linked to specific exposures, jobs, functions or departments at Spring House, it is not entirely possible to rule out

a workplace explanation as a result of these analyses. Likewise, the possibility exists for this finding to represent random clustering of this rare disease or to be related to confounding by additional non-occupational risk factors. C. Baase, et al, "A report on the Mortality Experience of the Spring House Research Facility in Montgomery County, Pennsylvania," 23 (October 25 2010)(emphasis added).

In short, the study concludes that it is completely unable to state with any degree of certainty what the cause of the increase in brain cancer is amongst this population, or indeed whether it has anything to do with the chemicals at Spring House, is related to some other factor completely outside the facility, or whether it is merely a statistical anomaly.

It is obvious why the Milby Report does not include a full or even partial recitation of these conclusions, as, though Milby failed to conduct any specific scientific study himself or rely on any other study, Milby somehow comes to the exact opposite conclusion as that of the University of Minnesota Report. Milby, after glossing over study's conclusions, finds "notwithstanding this exposure characterization problem, I believe that it can be said with reasonable medical certainty that these exposures did indeed cause the observed excess of brain cancer." Milby Report, 5. Basic scientific rigor would suggest that Milby would then state his own methodology for how he came to this certainty in the face of the only scientific study regarding this matter that he consulted stating that such

certainty was an impossibility with the evidence available. Milby, however, does not state any scientific methodology that he used nor does he call into question the University of Minnesota Report's methodology that might make its findings incorrect, rather he simply states his own opposite conclusions without any further support.

Indeed, despite Milby initially claiming that his opinion is based on a reasonable degree of medical certainty, he then couches his opinion in numerous terms of ambiguity, vagueness, and uncertainty. Amongst other things, Milby states:

> I offer this opinion with full knowledge that neither the responsible causal agent or agents, nor the precise exposure variables can be wholly identified, and/or characterized. Yet [decedent's] fatal brain cancer more likely than not occurred as a consequence of his work at Spring House facility. Moreover, this chain of events leads me to opine, with a reasonable degree of medical certainty that their some — as yet unidentified — brain cancer risk factors are at play at the Spring House facility. Milby Report, 5 (emphasis added).

In short, despite using the "magic words" regarding medical certainty, his entire conclusion is based on the premise that he has no evidence of what chemicals the decedent was exposed to or what effect they have on the human body, but that some chemical must have caused the Glioblastoma Multiforme cancer. The entire conclusion of the Milby Report is nothing more than a logical post hoc ergo propter hoc fallacy — decedent worked at Spring

House, then decedent died of brain cancer, therefore working at Spring House caused the decedent to die of cancer. While such an opinion might ultimately be proven correct, nothing in the Milby Report provides any evidence to support the conclusion.

This lack of evidence is demonstrated by the other information allegedly reviewed by Milby in coming to his opinion. The Milby Reports states that he reviewed a list of chemicals identified as possibly causing brain cancer as well as the decedent's pathology report. In his report, however, Milby failed to cite a single one of these chemicals that possibly cause brain cancer, failed to cite a single piece of evidence in the decedent's pathology report that would link his brain cancer to a chemical agent, and failed to cite a single chemical found or produced at the Spring House facility that has been linked to brain cancer. While the court understands that the Spring House facility has been in operation for decades and that many chemicals have been produced there during that time, the complete absence of a single piece of specific evidence or even an apparent attempt to obtain any specific evidence cannot be ignored when analyzing the Milby Report's opinion.

Ultimately, the Milby Report seems to be little more than an unscientific lay opinion given by someone who happens to be a medical doctor. A review of the evidence provided for Milby's opinion is illustrative: brain cancer causing chemicals found or produced at the Spring House facility — unknown; brain cancer causing chemicals the decedent was exposed to — unknown; methodology used

by Milby — unknown; previous University of Minnesota Report on causes of brain cancer occurrences in former Spring House employees — inconclusive; flaws, if any, in the University of Minnesota Report methodology — unknown. Despite every relevant factor being unknown, Milby still states he was medically certain, leading to the court's conclusion that this essentially was an uninformed opinion based on mere time, place, and circumstance.

Due to the foregoing, a Frye analysis was unnecessary as the Milby Report did not meet the basic requirements of Pa.R.E. 702. No "scientific, technical or other specialized knowledge beyond that possessed by a layperson" appears to have been used in formulating the opinion. This is demonstrated by the lack of any specifics regarding possible chemical sources or causes for the decedent's brain cancer, and the conclusions of the University of Minnesota Report that were then wholly discarded by Milby to come to the opposite conclusion, which was informed merely by the fact that the decedent worked someplace where chemicals were prevalent. As such, the Milby Report and/or Milby testimony would not have assisted "the trier of fact to understand the evidence or to determine a fact in issue," as the report contained no evidence, causal or otherwise, linking the decedent's brain cancer to the Spring House facility. Finally, keeping in mind the points made by *Grady v. Frito-Lay, Inc.* court, the Milby Report failed to meet both the burden of proving its proposition and, despite the plaintiff's protest to the contrary, that any scientific methodology at all was used in coming to its conclusion, let alone that it was generally accepted in the

scientific community. Due to these numerous flaws, the court properly found that the alleged scientific, technical, or specialized evidentiary value of the Milby testimony would not have aided the trier of fact in determining a fact in issue, did not meet the requirements of Pa.R.E. 702, and, thus, precluded it.

Without medical or scientific expert testimony regarding the cause of the decedent's brain cancer, the court properly granted the defendants' motion for summary judgment. Without the expert testimony, and because no other evidence was presented demonstrating that the decedent was exposed to chemicals that could be found to cause Glioblastoma Multiforme cancer, there was no evidence with which a trier of fact could conclude that there was either a breach of the duty of care by the defendants or that the defendants actions were cause of the decedent's cancer and death. Accordingly, the motion for Summary Judgment was properly granted as there were no disputes of material fact and those facts in evidence entitled the defendants to judgment as the plaintiff would be unable to meet the burden needed to prove the elements of her case.

## III. Conclusion

The Milby Report was based on broad leaps of logic, virtually no specifics of any kind that would assist a trier of fact, and a clear lack of any ascertainable scientific methodology. As this was the case, it failed to meet the admission standards of Pa.R.E. 702, rendering a Frye analysis unnecessary, and was properly precluded by the

court. As the plaintiff failed to present any evidence of a scientific or medical causal link between the decedent's death and his time working at the Spring House facility, the court properly granted summary judgment for the defendants. For these reasons, the order of April 17, 2012 granting the defendants' motion to preclude the testimony of Thomas H. Milby and motion for summary judgment should be affirmed.