**Portside Investors. L.P. v. Northern Ins. Co. of New York**

498

*John L. Jenkins* and *Hugh J. Hutchison* , for plaintiffs.

*Kevin J. O'Brien, Elizabeth A. Hunter, Patricia A. Fecile-Moreland* and *Edward M. Koch,* for defendant.

BERNSTEIN, *J.,* January 13, 2011—In December 2002, Portside commenced this action against Northern claiming breach of contract, breach of the duty of good faith and fair dealing and statutory bad faith. The trial was bifurcated, with the bad faith claims tried non-jury subsequent to the jury verdict. The contract action was tried before a jury in May 2008. On May 30, 2008, the jury returned a verdict in favor of Portside and against Northern. The jury found that Northern breached its contract of insurance with Portside and awarded plaintiff $1,407,859.00 as the actual cash value of the pier at the

time of the collapse.[1] The court reduced the verdict to $1,207,859 to reflect a prior payment of $200,000.00. The bad faith claim was tried non-jury on October 5, 6 and 7, 2009 before this court. Based on the evidence presented, the court appropriately found that defendant's conduct did not amount to bad faith under 42 Pa. C.S. A. § 8371.

On June 9, 2008, defendant filed a motion for post trial relief regarding the jury verdict.

On June 30, 2008 plaintiffs filed an answer in opposition to the motion for post trial relief. Judgment was taken by plaintiff pursuant to Pa.R.Civ.P.227.4 (1) (b) on July 21, 2010. On August 19, 2010 defendant appealed.

In this breach of contract and bad faith action, the plaintiff Portside Investors, L.P. (hereinafter "Portside") sought compensation for loss for the value of the pier itself, sustained when Pier 34 collapsed. Plaintiff Portside was the owner of Pier 34 on the Delaware River in Philadelphia. The Pier was subject to a triple net lease to HMS Ventures which operated a restaurant facility at the site the restaurant ship Moshulu was moored. The principals of HMS Ventures were Michael Asbell and Eli Karetny. HMS and Portside were insured under a first party Property Policy issued by Northern. The Northern policy insured against risks of direct physical loss to the pier and the building and property in an amount up to $4,300,000.00. The policy excluded certain causes of loss. Collapse of the pier itself was excluded unless the collapse had been caused by "hidden decay." If caused by "hidden decay" the collapse of the pier itself was a covered loss. The

---

1. The jury also found that the plaintiff did not breach its contract of insurance when it failed to file this lawsuit within the two years of the collapse of the pier.

policy also provided additional coverage including debris removal, demolition expense and business interruption. As to the loss of the pier itself, if covered, the policy provided for payment of "actual cash value." "Actual cash value" was specifically defined as replacement cost less depreciation.

On May 18, 2000, a portion of Pier 34 collapsed, causing three deaths and numerous injuries. Portside filed an insurance claim with Northern.[2] Portside hired Clark & Cohen/Claims International LLC, a public adjuster, for the loss. Frank Mahoney was designated as the principal adjuster in the Portside claim. Northern hired Stan White of Ocean and Coastal Consultants ("OCC") to investigate the cause of the collapse.

On October 19, 2000, Portside submitted a sworn proof of loss seeking in excess of $15 million. The sworn statement identified the cause and origin of the loss as "Hidden Decay."

The submission consisted of replacement cost for the building on the pier, the 200 feet of damaged pier, debris removal and one year of lost rental income. The submission by Portside did not provide any claimed actual cash value for the pier.[3]

On February 23, 2001, Northern informed Portside that first party property coverage was available under the policy for certain property damage and related business interruption and extra expense resulting from the collapse.[4]

2. HMS also submitted an insurance claim for this loss. Although HMS filed a lawsuit, Northern eventually settled the claim.

3. Under the policy, replacement cost is only provided if the pier was actually replaced. If the pier was not going to be replaced the insured received the actual cash value of the pier. The pier was not replaced.

4. Portside Exhibit "157."

Northern proceeded to determine the actual cash value of the pier since the pier was not going to be replaced. In April 2001, after a comprehensive professional investigation which included an underwater survey, a review of historical records including soil borings, lab analysis of borings and creation of a model of the pier and its condition before it collapsed, OCC concluded that the physical structure of the pier had far exceeded its useful life, had been poorly maintained and was worthless at the time of the loss and therefore had no actual cash value.[5]

In July 2001, Northern paid Portside approximately $2.7 million in settlement of many of Portside's claims including the loss of structure on top of the pier, the costs of debris removal and lost income for one year. Despite concluding that the actual cash value of the pier was zero, Northern made a payment of $200,000 to Portside for the pier.

In June 2001, Northern advised Portside as follows:

Based on a review of the historical documents, as well as an on-site investigation, OCC found the maintenance of the pier to have been minimal over the course of its almost one-hundred year existence. As the graph reflects, the pier was well beyond its useful life at the time of it collapse on May 18, 2000. Under these circumstances, we believe the $200,000 ACV proposed for the pier is extremely fair.[6]

On August 16, 2001, Portside informed Northern that it disagreed with the conclusion, methodology employed and the factual support used to determine the actual cash

_____
5. Northern Exhibit "17."
6. Northern Exhibit "311."

value of the pier and demanded an appraisal under the policy. Notwithstanding Portside's demand for Northern to appoint an appraiser, Portside itself never designated an appraiser. Neither did Portside apply to the court to require Northern to designate an appraiser or seek court appointment.

On the very day that Portside demanded an appraisal, a grand jury in Philadelphia indicted Michael Asbell and Eli Karetny for involuntary manslaughter and other offenses relating to their conduct in ignoring prior warnings by engineers and others that the pier was unsafe and in danger of imminent collapse.

The presentation filed in support of the indictment demonstrated that Portside's principal knew about the pier's decay before the collapse. The presentation provided:

> The condition of the pier had obviously deteriorated severely by early May 2000. On May 9, 10, 17 and 18, 2000, servicemen from Suburban Propane Company went to Pier 34 on those occasions to replace a pipe that was leaking gas. The bent pipe had moved and pulled toward the river, and they needed to extend it near the point of the eventual collapse. On May 12, 2000 Eli Karetny notified a carpenter/contractor that he needed him to fill the same crack the carpet installer had filled several months earlier. The contractor arrived with his worker on May 15. The crack was again filled with more concrete.
>
> On May 16, divers from Commerce Construction Company inspected the outshore substructure of the pier. Jesse Tyson took Eli Karetny out in the diver's boat to show him twisted piles that indicated continued

pier movement. The divers reported that the fill was leaking through the lower deck and some timber piles were leaning outshore. It was also observed on May 16, 2000 that the crack in the top deck, which had just been filled with concrete the previous day, had already reopened and was getting progressively wider. The contractors filled it again but it reopened again on May 17. By this time, many employees were expressing concern that the pier would collapse. Jesse Tyson told Michael Ashell on May 17, 2000 about the diver's observations concerning the condition of the piles. During this conversation, Tyson and Asbell discussed the recent collapse of the South Jersey Port Corporation pier on the Camden side of the Delaware River as an example that old piers become weak and do collapse.

On the morning of May 18, 2000 after discussion with Michael Asbell, Eli Karetny phoned and told his insurance broker that he thought the pier was sinking; the broker then faxed an insurance claim report into the insurance company. Eli Karetny also called and told Jesse Tyson that the filled crack was wider and new cracks had appeared. When Jesse Tyson arrived at the pier in the early afternoon, he noticed that the crack had grown from 3 inches wide on May 16 to 11 inches wide on May 18. Various employees gave varying descriptions on the width of the crack, but all agreed that it had widened significantly by May 18, 2000. Jesse Tyson told Michael Asbell and Eli Karetny on the early afternoon of May 18 that the pier was in a state of failure and would probably collapse at the next low tide, 8:00 p.m. that night, or the low tide the next morning. Despite this warning, Michael Asbell and Eli Karetny did not close the pier but, instead, opened the

club for business that night...[7]

The Commerce Construction Corporation divers' report had made the following finding:

> Area of timber decking have openings between adjacent members and some decking members show deflection and settlement not bearing on support members-allowing granular fill to seep out causing voids and settlement.[8]

Before agreeing to acknowledge receipt, Mr. Asbell had the divers change the findings portion of the report to read:

> Area of timber decking have openings between adjacent members and some decking members show deflection additional inspections to follow (handwritten on document).[9]

Asbell had important knowledge of the pier's condition and maintenance. This information would be useful to accurately determine the value of the damaged property and the issue of fortuity. If Asbell had knowledge of a danger of "imminent collapse" the collapse was not due to "hidden decay." After learning of the indictment, Northern informed Portside that it was reopening its investigation as to both coverage and value of the loss and requested that Mr. Asbell appear for an examination under oath. As was his constitutional right, Mr. Asbell declined to present testimony under oath while criminal charges were pending.

---

7. Northern Exhibit "127."
8. Portside Exhibit "75."
9. Portside Exhibit "76."

At trial plaintiff presented two expert witnesses, Mr. William Castle and their public adjuster Mr. Frank E. Mahoney. Mr. Castle testified to the cost to rebuild the pier. Mr. Castle provided no testimony about the value of the pier prior to its collapse. He provided no testimony as to its actual cash value as defined by the policy. Only plaintiff's public adjuster expert Mr. Mahoney testified to the actual cash value of the pier at the time of the loss.

Expert Castle, whose deposition was presented to the jury stated at page 207:

Q. Did you ever develop an actual cash value figure?

A. No, that's not my expertise.

Q. But you were asked to, correct?

A. Yes, but it's not my field. That's like an appraiser. I'm not an appraiser.[10]

Plaintiff's expert, Mr. Mahoney, was the only witness presented by plaintiff to offer any opinion as to "actual cash value" as defined in the policy of insurance. Mr. Mahoney is a public adjuster and not an appraiser. At trial Mr. Mahoney was qualified as an expert only due to the incredibly liberal requirements of the Pennsylvania Rules of Evidence. He had "a reasonable pretention to specialized knowledge on the subject under investigation,"[11] namely the field of the value of old deteriorated piers on the Delaware River in Philadelphia. He did not, however, present testimony which was relevant to any question for jury determination. His testimony was clearly based exclusively upon, and directed exclusively to, the settlement of insurance

---

10. Deposition of William Castle pg. 207 line 9-16.
11. *Miller v. Brass Rail Tavern*, 664 A.2d 525 (Pa. 1995).

claims for old deteriorated piers on the Delaware River in Philadelphia. He employed no appropriate methodology to actually determine the actual cash value of this specific old deteriorated pier in Philadelphia on the Delaware River pursuant to the policy language which defined actual cash value as replacement cost less depreciation due to structural deterioration. In substance, the opinion of plaintiff's only expert witness on actual cash value could not, and did not, provide evidence which could "assist" the jury to understand the evidence or to determine a fact in issue, namely the actual cash value.[12]

Plaintiff's expert made no evaluation of replacement costs, the necessary starting point to determine the value of the covered loss according to the clear language of the insurance policy. He relied exclusively on the testimony of Mr. Castle. Starting with Mr. Castle's replacement costs conclusion, plaintiff's expert did no necessary calculation of depreciation.

Plaintiff incorrectly asserts that this case "requires the expert testimony of a person who has expertise in valuing a pier for the purpose of adjusting a property damaged loss. That is Mr. Mahoney's exact expertise." Because of this misperception, Mr. Mahoney's testimony "does not assist." Public Adjuster Mahoney opined only on what the defendant insurance company should have done and should have paid in settlement. He made no secret of this fact:

Q. And you're testifying as to your expert opinion on a reasonable compromise value for some negotiated resolution of the value of this pier; is that right?

---

12. See Pa. R. E. 702; *Comm. v. Rounds*, 542 A.2d 997 (1988); *Grady v. Frito-Lay Inc.*, 839 A.2d 1038 (2003).

A. Yes.[13]

While Mr. Mahoney agreed to the policy definition of actual cash value and also agreed to the correct Pennsylvania standard, he admitted he was not using that standard in his testimony:

Q. And you agree with me that actual cash value is not market value; is that right?

A. That's correct.

Q. It's not what you could sell something for, it's the value of the physical sticks and bricks of the structure; is that right?

A. Well, on some adjustments market value does come into play.

Q. But not in the state of Pennsylvania, does it?

A. No.

Q. So "some adjustments" don't matter if we're not in Pennsylvania, do they?

A. No.

Q. So as far as the law in Pennsylvania is concerned, market value does not matter, does it?

A. My opinion is that it does come into play.[14]

Plaintiff's expert's testimony was also biased to the point of irrelevancy, possibly because he had a direct financial interest in the outcome of the lawsuit:

---

13. N.T. May 27, 2008 pg. 77 line 7-11.
14. N.T. May 27, 2008, pg. 87 line 24- pg. 88 line 24.

Q. Yes, when you were writing all these letters, how were you going to be paid for the work you were doing?

A. I was part of a team that had a contract with Mr. Asbell, Portside Investors, and I was the guy that did most of the work and got the small piece of change.

Q. But your small piece of change was based on a percentage of recovery; correct?

A. Yes.

Q. So the more Portside got paid, the more you got paid; is that right?

A. In that situation, yes.

Q. And I think you said in your deposition you got a piece of the action; is that right?

A. Yes.[15]

_____

15. N.T. May 27, 2008, pg. 148 line 23- pg. 149 line 14. Mr. Mahoney's interest and bias was further exemplified by his contorted logic concerning the definition of the word "hidden." He testified:
Q. If the insured knows about the decay, is it hidden decay just because it's under water?
A. If he can't see it, it's hidden decay.
Q. My question was, if the insured knows about it, is it still hidden decay?
A. Well, it goes to the point of fortuity. If he knew about the, we're going to have an imminent collapse before the fact, then there is no coverage.
The court: Does that mean your answer is "Yes" or "No."
The Witness: My answer - well, yes, it's under water.
The court: So if it's under water, even if they know about it, it's hidden; correct?
The Witness: Yes, that's correct.
Q. Okay, well indulge me, Mr. Mahoney, in a hypothetical: if hypothetically speaking, on May 18th, 1999, one year prior to the collapse, the insured is told that your pier is decayed and this decay could cause a collapse, is that decay still hidden decay, or is it now

Settlement and trial are two different worlds. There

known to the insured and it's no longer hidden decay?

A. Well, it comes down to what is the percentage of decay? I mean, if the place is ready to fall down, that's one thing; but if they're not in that situation, then it's nothing that they have to worry about.

Q. Well, does the insurance policy here draw a distinction between the percentage of decay that causes a collapse, or does it simply exclude a collapse unless caused by hidden decay?

A. In this case it covers for hidden decay which causes a collapse.

Q. And as we said, that means it excludes collapse caused by known decay; correct?

A. That would be correct.

The court: But not known decay if it's hidden by water; right?

The Witness: Correct.

The court: So hidden really doesn't matter whether they know about it or not if it's hidden, like, by water.

The Witness: Yeah, they don't know about it.

The court: Oh. You mean even if they know about it, if it's hidden by water, they don't know about it? Is that your testimony?

The Witness: Well, what is happening is if they're being told by a third party that you have decay, and the question then becomes well, how severe is the decay, is it something that means that the next day the pier is going to collapse, or is it in five years the pier might collapse. So it becomes a factual situation. So they may be told by somebody that hey-

The court: If they're told there's serious decay but it's hidden by water, then that's hidden decay; isn't it?

The Witness: That's correct.

The court: Right. So it doesn't matter what they know, does it? As long as it's hidden by water, it's hidden decay; right?

The Witness: Yes.

The court: So it don't matter what they know.

The Witness: Right.

The court: Okay, How about if at low tide you could see that there were twisted piers. Is it still hidden decay because at high tide it's covered by water, in your opinion?

The Witness: Well, the piles-there's a flow of probably five feet every day in the Delaware River, it goes up and down; but you still, in order to see those piles, have to be in a boat. You can't see them from topside.

The court: So it's not just covered by water that's hidden, it's if you can't see it from the top.

The Witness: Right.

The court: So then to my question, even if there are twisted piers that show decay that you can see at low tide, then it's still hidden decay; right?

The Witness: That is correct.

N.T., October 6, 2009, pg. 190 line 14- pg. 196 line 12.

are countless reasons parties settle a claim without filing a lawsuit, or during the pendency of a lawsuit, or while awaiting a verdict or while a verdict is on appeal. First party claims may settle before a lawsuit is filed for a value different from the actual cash value which can be proven because one or the other side does not have complete information. Cases may settle for a value different from the actual cash value which can be proven because one side has incorrectly evaluated the claim. Cases may settle for a value different from the actual cash value which can be proven because the costs of proceeding to court are greater than the remaining financial differences in controversy. Cases may settle for a value different from the actual cash value which can be proven because one side negotiates more effectively or more adamantly than the other side. Cases may settle for a value different from the actual cash value which can be proven because one side needs to resolve the matter for business reasons extraneous to the specific merits of the claim.

Many of the reasons for settlement before suit may become inoperable once a case is filed in court. Once a lawsuit is filed, however, other reasons for settlement appear. Cases may settle for a value different from the actual cash value which can be proven because judges unmercifully insist on settlement, require repeated conferences, or require the presence of claims adjusters, insurance executives, or even corporate officers in court. Cases may settle for a value different from the actual cash value which can be proven because of the risk of obtaining a result less favorable than the cost to settle. Cases may settle for a value different from the actual cash value which can be proven because insurance adjusters can justify paying more than the claim is worth

to avoid risking adverse career implications should a jury dramatically disagree with the final offer. Although wrong as a matter of law, some insurance adjusters may settle for a value different from the actual cash value which can be proven because they believe, as testified at the trial by plaintiff's expert Mr. Mahoney, "the insurance company has an obligation to settle every claim." Some cases may settle for a value different from the actual cash value which can be proven because it may simply be more convenient to settle than risk the uncertainties of results and incur the certainty of attorney's fees of actually proving value by the rigors of a courtroom. The appropriate value for settlement, or the appropriate procedure for negotiating a settlement of an insurance claim is any appropriate methodology for determining the value of the "actual cash value" as defined by the insurance policy covering an old deteriorated pier on the Delaware River in Philadelphia. Proof at trial is totally different from talk in settlement negotiations. The biggest difference of course, between settlement negotiation and the courtroom, is that at trial "talk" must survive cross-examination. "Talk is cheap." In the courtroom, talk rubber meets the cross-examination road in a crucible from which truth emerges.

Hired gun experts may write a report on topics tangential to their true expertise or even any true "reasonable pretension"[16] to expertise. Hired gun "interested" experts may write a report without expressing their opinions with any degree of certainty. Hired gun experts may write a report without having any real factual basis "of record." Hired gun experts may write reports which do

---

16. The standard for expert testimony in Pennsylvania is the incredibly lax criteria of "reasonable pretension to expertise." See *Miller v. Brass Rail Tavern*, 664 A.2d 525 (Pa. 1995).

not comply with any accepted expert methodology in any field. Indeed, hired gun experts may write a report which subtlety employ definitions confounding correct legal standards. This is exactly what occurred in this trial. This is specifically admitted in the testimony of Mr. Mahoney and specifically referenced in plaintiff's response to defendant's post verdict motions.

Plaintiffs articulate their incorrect view of the issue in this trial. Plaintiff accurately portrays its "expert" as an expert in the adjustment process generally, with directly applicable experience in the evaluation and adjustment of claims arising from damage to piers. He is this, but nothing more. Mr. Mahoney does not consider himself anything more than an expert in the settlement of claims. In its brief plaintiff admits: "As Mr. Mahoney testified when asked if he considered himself a 'pier expert' he responded that he has substantial expertise as a claims adjuster who handles many pier lawsuits." He admitted that he was testifying based upon his expertise as a public adjuster and opining only on the proper settlement or "adjustment" of the claim:

Q. And you're testifying as to your expert opinion on a reasonable compromise value for some negotiated resolution of the value of this pier; is that right?

A. Yes.[17]

Both sides agree on the precise definitional standard contained in the applicable insurance policy. The defendant must pay only the "actual cash value" of Pier 34 moments before it collapsed, actual cash value is specifically defined in the policy as "replacement cost less depreciation." Both

17. NT. May 27, 2008, pg. 77 line 7.11.

sides also agree that depreciation must be determined by considering the age, condition, obsolescence, maintenance performed and maintenance needed. Plaintiff's public adjuster expert agreed that that maintenance, and repair costs are factors which had to be considered.[18] What the actual cash value of Pier 34 is, as defined in a policy, is a fact which must be determined by a jury based on proper evidence about the condition of Pier 34 before its collapse.

To make a factual finding of the "actual cash value" of Pier 34 moments before it collapsed into the river a jury needs the assistance of opinion rendered by expert witnesses who "by training education or experience have achieved some level of expertise beyond the range of normal experience." That expert must offer opinions with the requisite degree of certainty using the insurance policy definition. Without appropriate expert testimony to help the jury, the jury has no reasonable basis upon which to make a proper factual determination of the actual cash value of Pier 34.

Nothing in Mr. Mahoney's qualifications or experience qualifies him to competently evaluate the condition, or the obsolescence, or the effect of the "maintenance" performed over Pier 34. Mr. Mahoney's testimony demonstrated that he was incapable of differentiating between "maintenance" needed to make money such as repairs to a parking lot and "maintenance" to stop a pier from collapsing into the river. Mr. Mahoney's testimony demonstrated that he could not, and did not, evaluate whether the work he called "maintenance" was functional to keep the pier structurally sound or in fact furthered deterioration. He

---

18. N.T. May 27, 2008, pg. 15 line 2 - pg. 20 line 10.

admitted that the only work undertaken at the pier that served to enhance the structural stability or value of the collapsed pier was the installation of eight "A" frames. He further admitted that he had no idea if those "A" frames were in any way effective in actually stabilizing the pier.[19] Nonetheless, he considered every penny spent on any type of "maintenance" appropriate for inclusion in his actual cash value methodology.

This opinion on the value of the "maintenance" done on the pier was clearly and unambiguously expressed: "...if $400,000.00 was spent then there was $400,000.00 of maintenance performed."

Q. And my next question then is if maintenance is done somewhere on the pier, but far away from the area that collapsed, does it have any bearing on the value of the area that collapsed that we're here about?

A. Let's put it this way. It does.

Q. We will get to the specific maintenance items. My question is very specific, Mr. Mahoney. Can you tell me one way or another if maintenance work done on some other part of the pier does anything to enhance the value of the 200-foot section that we're here about today?

A. My answer to that is yes, it does enhance the value of the pier totally, not just the 200 feet, but the 550 feet.

Q. And would paving and grading let's say on the inshore of the pier, inshore end of the pier 300 feet away from the collapsed area, do anything to enhance the value of that outshore end of the pier?

---

19. N.T. May 27, 2008, pg. 109 line 7 - pg 110 line 12.

A. I'm not sure I can answer that question.[20]

Q. In that same paragraph, Mr. Mahoney, you list amongst your maintenance items wheel stops. What's a wheel stop?

A. I don't know.

Q. Is it that little concrete barricade that keeps a car from rolling a little too far so if the wheel hits it, it stops the car from going forward?

A. That would have been the parking lot of the

pier.

Q. Right. Is that a wheel stop?

A. I don't know.

Q. So when you wrote it, you weren't sure what you meant by wheel stop?

A. No.

Q. If a wheel stop is what I'm telling you it is, how would that enhance the value of the pier, the pier structure itself?

A. The pier structure?

Q. Right.

A. It was part of the improvement that was put in.

Q. So putting in a wheel stop keeps the pier from falling down?

A. Has nothing to do with the pier's structure in that

20. N.T. May 27, 2008, pg. 99 line 22 - pg. 102 line 20.

sense.[21]

Q. Mr. Mahoney, did the repair of the area that collapsed in 1995 do anything to enhance the structural stability of the outshore end that collapsed on May 18th of 2000?

A. No.

Q. In the 1995 to 1996 time period you've got the installation of the H piles stabilization system; correct?

A. Yes.

Q. And that was the $350,000 in work that was done; is that right?

A. Yes.

Q. Have you also heard H piles called A frames?

A. Yes.

Q. Same repair; correct?

A. Yes.

Q. What is your understanding as to the success of the installation of those A frames or H piles?

A. Well, they were -- the success?

Q. The success.

A. The problem that was established in 1995 was to install this installation to make it be stable.

Q. That was the goal or objective; correct?

A. Yes. Frank E. Mahoney - Cross

Q. Did it work?

21. N.T. May 27, 2008, pg. 106 line 15 - pg 107 line 15.

A. It worked until 2000.

Q. Well, how much longer did that section of the pier remain standing because of the installation of those H piles or A frames?

A. I can't answer that.

Q. Do you have any idea?

A. No.

Q. Do you know if it stayed up even one day longer because of the installation of those H piles?

A. I have no idea.

Q. did you consider this August 19th, 2004, report prepared by W. J. Castle?

A. I've never seen this report before.

Q. You've never seen it before?

A. No.

Q. No one has ever given it to you?

A. No.

Q. Were you aware that Mr. Castle was very critical of the H pile or A framework that was done on the outshore end of the pier?

A. I'm not aware of that.

Q. We can read some of this letter together then since you haven't seen it before.

Q. Turn to Page 2.

Q. Mr. Mahoney, if you could look at the second page of this document, very last paragraph. Toward the end of that paragraph it starts, "However as discussed in more detail below." Do you see where I am?

A. Yes.

Q. It says, "However, as discussed in more detail below, those A frame structures was inadequate to arrest the outshore movement of the pier, a factor which should have been obvious to any engineer who took the time to perform certain elementary and essential engineering calculations." Do you see that?

A. Yes.

Q. Were you aware that that was Mr. Castle's opinion?

A. No.

Q. Are the A frame structures referenced here the same as the H piles in your maintenance letter?

A. Yes.

Q. Sure. After reading the section of Mr. Castle's report that we just read together, does that at all change your opinion as to whether the installation of those A frames or H piles was a valuable maintenance item that enhanced the value of that 200-foot section of the pier?

A. In my opinion, yes, still enhanced the value.[22]

_____

22. N.T. May 27, 2008, pg. 109 line 2 - pg. 114 line 9. Plaintiff's other pier expert, William Castle admitted that those "A" frames were not properly designed and did not arrest the out shore movement of the pier and were either inadequate or futile. His testimony was unequivocal:
> Q. You don't know if it extended the life that pier by one hour do you?
> A. No I don't.

Deposition of William Castle, pg. 175 line 9-12.

Q. What happens if the maintenance expenditures don't actually work?

A. Doesn't matter.[23]

This is not expert evaluation applied to the question presented for jury determination, this is partisan adoption of all amounts spent without any consideration of what it was spent on. Thus he considered parking lot repairs, and repairs to areas of the pier having no relation to the part of the pier which collapsed, as significant "maintenance" for evaluating an actual cash value. He either did not choose to evaluate the "maintenance" at all or was actually incapable of making this evaluation:

Q. And when you looked at those underwater videotapes did you know what you were looking at?

A. Didn't mean anything to me.

Q. In fact, Mr. Mahoney, you are not a pier expert, are you?

A. I am a claims adjuster who handles many pier losses.

Q. Let me ask the question again. Do you consider yourself to be a pier expert?

A. My experience and expertise is in adjusting insurance claims which included 27 pier losses.[24]

Q. Sure. Mr. Mahoney, do you recall that I asked you that same question, let me get the date here for you, during the deposition on May 24th, 2007? Do you recall being

23. N.T. May 27, 2008, pg 45 line 18 - 20.
24. N.T., May 27, 2008, pg. 81 line 14-pg. 82 line 3.

asked that question whether you considered yourself to be a pier expert?

A. No, I do not.

Q. Do you?

A. I do not.

Q. Okay. Then let me read it to you. My question was -- it's on Page 42 of the transcript, Line 16: "Do you consider yourself to be an expert in valuing damage to real property?"

MR. HUTCHISON: Can we have the answer to that?

Q. And the answer in part was, "So to answer your question, I don't know if I would qualify as an\ expert, but I certainly know my way around the claims." Do you recall that question and answer?

A. Yes.

Q. So you don't consider yourself to be an expert in valuating property?

A. I do consider myself being able to value a claim which involves the matter of a pier. I'm not a pier builder. I don't do that.[25]

This is opinion which cannot "assist" the jury in any factual determination in this case.[26]

Mr. Mahoney has only been involved in adjusting

---

25. N.T., May 27, 2008, pg. 82 line 11 - pg. 83 line 15.

26. Plaintiff claims this opinion is relevant because they inexplicably, incorrectly, but explicitly, state that the calculation of the actual cash value of a pier is a calculation not of the value of a pier as defined in the policy, but rather is the calculation of the proper adjustment or settlement of a property damage insurance claim.

insurance claims. The basis of his opinion was the adjustment of other pier claims on the Delaware River. While this may be relevant experience if the question is the adjustment or settlement of pier claims it is not relevant in court concerning the replacement cost less depreciation which requires evaluation of: "age, condition, obsolescence, the amount of maintenance performed on the property, and the amount of maintenance the damaged property would require to retain the ability to function in its intended purpose."

Mr. Mahoney did not even appropriately use whatever relevancy his prior experience in adjusting pier losses might have had. He considered only the settlement or adjustment process.

He did not even compare the condition of his other pier claims to the condition of Pier 34 at the time of its collapse. He has no expertise which would allow him to make any such comparison.

He admitted he had no appreciation of why any of the piers collapsed:

Q. Mr. Mahoney, what is your understanding as to why -- or let me try a different question. Do you have an understanding as to why this 200-foot section of the pier collapsed?

A. I do not. I have a theory, but I don't know how it collapsed.[27]

Q. Did those other structures collapse because of decay?

A. Three of them collapsed, we don't know why.

---

27. N.T., May 27, 2008, pg. 91 line 14-19.

Q. Did those other structures --

THE COURT: So then the answer is no, they did not collapse because of decay because you don't know why they collapsed; right?

THE WITNESS: Yes.[28]

Plaintiff claims that Mr. Mahoney's expertise is in "valuation approaches to the losses that have been accepted within the insurance industry." The fact that he has been previously qualified as an expert "in the fields of interpretation of insurance contracts, claims handling procedures, and loss adjustments" qualifies him to testify to valuation in settlement, not to the replacement value of a pier less the effect of the maintenance or lack of maintenance over the past 100 years. In fact, he was only offered as an expert in his true fields of expertise, claims adjustment:

MR. HUTCHISON: Your Honor, if you would like, I'd like to offer Mr. Mahoney as an expert on insurance interpretation and on adjustment policies and --

THE COURT: And what? I missed the third.

MR. HUTCHISON: Adjustment procedures and policies.[29]

The next morning he was questioned as to his understanding of actual cash value. His understanding was a "settlement" of a claim understanding, not a factual determination based upon expert evaluation understanding:

THE COURT: Is the settlement the same as the actual

---

28. N.T. May 27, 2008, pg. 128 line 17-25.
29. N.T. May 27, 2008, pg. 105 line 11-17.

cash value?

THE WITNESS: Yes.[30]

Q. You testified under questioning by counsel for Portside that you view the actual cash value process to be the product of compromise or negotiation between the insurance company and the insured. Do you recall that testimony?

A. Yes.

Q. Can you show me where in the policy and I'll direct you to Exhibit No. 1 of the binder, where in the policy it defines actual cash value as being the [10] product of compromise between the two parties?

A. It's just the tool we use in the adjustment business.

Q. My question, Mr. Mahoney, can you show me where in the policy Portside Exhibit 1 where it says that actual cash value is to be determined by a compromise between the insurance company and the insured?

A. It doesn't say that.

Q. And, in fact, it says that actual cash value is determined, by depreciating the replacement cost; isn't that correct?

A. Yes.

Q. So there's no requirement that the insurance company reach a compromise negotiated resolution, is there?

A. Sir, the object is to settle the loss.

---

30. N.T. May 27, 2008, pg. 52 line 2-4.

Q. Is there a requirement in the policy that the insurance company compromise or negotiate in order to determine the actual cash value of the damaged property?

A. They have an obligation to settle the loss.

Q. Is there a requirement in the policy, Mr. Mahoney, that the insurance company must compromise or negotiate with the insured in order to arrive at the actual cash value of damaged property? Do you understand my question?

A. I heard the question.

Q. Is there a requirement in the policy that they do that?

A. There's not a requirement.

Q. Okay. So if the insurance company thinks that the claim is way too high, let's say $13 million to replace 200 feet of pier, are they obligated to find some common middle ground there?

A. They have an obligation to --

Q. Are they obligated to find some common middle ground?

Q. Yes or no?

A. The object is to settle a loss.[31]

---

31. N.T. May 27, 2008, pg. 68 Line 25-pg. 70 line 7. Mr. Mahoney is certainly qualified to provide expert testimony on the issue of insurance bad faith. The bad faith aspect of this lawsuit is addressed in a separate opinion, in which the "fields" of interpretation of insurance contracts, claims handling procedures and loss adjustments are the appropriate field of expertise. With respect to the depreciation to be applied to the replacement cost of this pier and the application of the definition contained in the insurance contract in question herein these fields of expertise are irrelevant.

Proof of the actual cash value as defined by the policy of insurance of the collapsed pier, just prior to the collapse, is an entirely different factual determination from the proper adjustment or settlement of a collapsed pier claim.

Finally, plaintiffs admit that Mr. Mahoney did not testify to any reasonable degree of certainty. Plaintiffs urge this court to find that some expert witnesses do not have to testify to any requisite degree of certainty and therefore to excuse Mr. Mahoney's failure in this regard. This is simply not the law of any jurisdiction. An expert witness need testify only to a "reasonable" degree of professional certainty as that expert self defines "reasonable" but he must testify to that "reasonable" degree of certainty.

They further claim that there is no requirement that any reasonable degree of "appraisal" certainty is required. This is simply incorrect. Were this to be a correct statement of law any credentialed expert with "reasonable pretentions to expertise" could offer personal opinion however unprofessional.[32]

While the law permits wide latitude in self-proclaimed experts' testimony, the most basic, incontrovertible minimum standard is that they are testifying to some

---

32. "The purpose of this standard is not, however, to render proof needlessly difficult, but to avoid speculation under the rubric of 'expert opinion.'" *Betz v. Erie Ins. Exchange*, 957 A.2d 1244, 1258 (Pa. Super. 2008), *app. denied* 995 A.2d 350 (Pa. 2010). Accordingly, speculative testimony from an expert witness is properly stricken. As was explained in *Kravinsky v. Glover*, 396 A.2d 1349, 1356(Pa. Super. 1979): "An expert fails this standard of certainty if he testifies that the alleged cause 'possibly,' or 'could have' led to the result, that it 'could very properly account' for the result, or even that it was 'very highly probable' that it caused the result."

professional standard even if self-defined.

Plaintiff's expert was not qualified to render an opinion on any relevant issue presented to the jury for determination.[33] Plaintiff's expert did not purport to render an opinion on any relevant issue for determination presented to the jury. Plaintiff's only expert on actual cash value used no methodology suitable to that question.[34] Plaintiff's expert had no factual basis for the opinions rendered.[35] Therefore the jury had no evidentiary basis upon which to render their verdict. The verdict herein should be reversed and a new trial ordered.[36]

---

33. "[A] witness who demonstrates by his own testimony that he has no experience or special knowledge of the matter at issue is incompetent as an expert." *Marlowe v. Lehigh Twp.*, 441 A.2d 497 (Pa. Commw. 1982).

34. An insufficient use of methodologies that fit the issue disqualifies the witness. In *Grady v. Frito-Lay, Inc.*, 576 Pa. 546, 839 A.2d 1038 (2003), the Supreme Court precluded expert testimony because the tests performed by the witness, although possibly standard in engineering generally, were not specifically tailored to the issue, which concerned safety in chewing food. The explicit ruling in *Grady* was that the methodology employed did not fit any question for determination in the case.

35. "[T]here must be some factual predicate for the opinion identified on the record..." *Starr v. Veneziano*, 560 Pa. 650, 663 n.10; 747 A.2d 867, 874 n. 10 (2000). An opinion premised on a fact which has "absolutely no evidence to support...the opinion is without a proper foundation..." *Jones v. Wilt*, 871 A.2d 210, 215 (Pa. Super. 2005). Where the disclosure reveals that the opinion is not based on facts that the jury could find from the evidence but rather is based on "conjecture or surmise" or "mere possibilities" it must be excluded. See *Viener v. Jacobs*, 834 A.2d 546, 558 (Pa. Super. 2003), *app. denied* 579 Pa. 704, 857 A.2d 680 (2004). "The expert testimony must have an adequate basis in fact.... If the testimony is expressed in a deficient manner, then it is considered incompetent." *Kelly v. Thackray Crane Rental, Inc.*, 874 A.2d 649, 653 (Pa. Super. 2005).

36. Because of the manner in which this judgment was taken, this court could not rule upon defendant's post verdict motions. Nonetheless, a new trial should be ordered.