**[J-17-2017] [MO: Saylor, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 81 MAP 2016 |
| | : | |
| Appellant | : | |
| | : | Appeal from the Order of the Superior |
| | : | Court dated June 12, 2015 at No. 2191 |
| v. | : | MDA 2014, vacating the Judgment of |
| | : | Sentence of July 21, 2014 of the Court |
| | : | of Common Pleas of Lackawanna |
| KENNETH MACONEGHY, JR., | : | County, Criminal Division, at No. CP-35- |
| | : | CR-0001450-2012 and remanding |
| Appellee | : | |
| | : | ARGUED: March 8, 2017 |

## DISSENTING OPINION

**JUSTICE TODD**                                     **DECIDED: October 18, 2017**

The majority holds that Dr. Novinger's expert opinion that C.S. was sexually abused was inadmissible because it was founded solely on his crediting her reports of the abuse and, thus, in the majority's view, invades the jury's province as the sole arbiter of witness credibility. In my view, the majority overlooks an important distinction between expert testimony *on the subject of* witness credibility, which is inadmissible, and expert testimony on other subjects which are merely *founded on assessments* of witness credibility, which are not *ipso facto* inadmissible. I am concerned that the majority's holding will lead to the exclusion of myriad types of salutary expert testimony which would not infringe upon the jury's role, but, rather, would assist the jury in its execution of its duties as the finder of fact. I further fear that the majority's holding is particularly troublesome in the context of prosecutions for child sexual abuse, where pediatricians frequently rely on non-physical evidence of such abuse, where physical evidence is exceedingly rare, and where juries commonly labor under outdated myths to

the contrary. Accordingly, I respectfully dissent, and would reverse the Superior Court's order and reinstate Appellee's convictions and judgment of sentence.

As the majority summarizes, in 2011, C.S. reported that, in the summer of 2005, when she was 11 years old, Appellee repeatedly raped and otherwise sexually abused her over a period of several months, at times when her mother and siblings were absent from their home. In the ensuing investigation, C.S. was referred to the Children's Advocacy Center of Northeastern Pennsylvania ("CAC"), where she underwent a forensic interview with a certified forensic interviewer, detailing the abuse, which was observed by the CAC's former director and then-consulting pediatrician, Dr. Novinger. C.S. then underwent a forensic medical examination performed by Dr. Novinger, who ultimately determined that C.S. was sexually abused.

Appellee was arrested and charged with, *inter alia*, rape, rape of a child, statutory sexual assault, aggravated indecent assault of a person less than 13 years of age, endangering welfare of children, indecent assault of a person less than 13 years of age, corruption of minors, and unlawful contact with a minor,[1] and proceeded to a jury trial, at which C.S. testified at length to the details of the abuse. Specifically, C.S. indicated that, during the summer of 2005, she lived with Appellee, who was unemployed, her mother, who worked during the day, and her siblings. C.S. testified that, after her mother left for work, Appellee would send her siblings to a relative's house or otherwise isolate her, whereupon he would force her to bathe with him and engage in vaginal intercourse and other sexual conduct in their bath, on their couch, and in his bedroom. C.S. further testified that she did not understand that his behavior was abnormal, but that, by 2011, she had begun to appreciate the nature of her abuse. C.S. explained

---

[1] 18 Pa.C.S. §§ 3121(a)(1), 3121(c), 3122.1, 3125(a)(7), 4304(a), 3126(a)(7), 6301(a)(1), and 6318(a)(1), respectively.

that, around that time, she was spending the weekend with her biological father and his girlfriend, and they were watching a television show which turned to the subject of rape, causing her to cry. According to C.S, her father then asked her if she had been victimized, and she ultimately disclosed what Appellee had done.

At issue herein, the Commonwealth elicited the testimony of Dr. Novinger, who testified at length to his experience as a pediatrician, and, particularly, as a pediatrician experienced in the evaluation and treatment of child sexual abuse victims. Specifically, Dr. Novinger indicated that he had 37 years of experience as a practicing, board-certified pediatrician, which included, *inter alia*, chairing the Department of Pediatrics at Geisinger Wyoming Valley Medical Center, externing with a Children's Advocacy Center in San Diego, California, founding a clinic at Geisinger for the evaluation and treatment of child sexual abuse victims, serving as CAC's medical director for several years, and holding numerous seminars for medical and educational professionals concerning child sexual abuse. Dr. Novinger estimated that he had evaluated between 500 and 1000 children for signs of abuse, and that he had testified in myriad civil and criminal cases involving child sexual abuse.

Based on this experience, the Commonwealth offered, and the trial court certified, Dr. Novinger as an expert in the fields of pediatrics and child abuse. Dr. Novinger indicated generally that his forensic medical examination consisted of observing C.S.'s forensic interview, taking her medical history, including her account of the abuse, and conducting a physical examination, which yielded no physical evidence of the abuse. Dr. Novinger clarified that the lack of physical evidence neither corroborated nor undermined the Commonwealth's allegations. Indeed, Dr. Novinger explained that the "overwhelming majority" of physical examinations involving similar abuse reveal no physical evidence of the same:

[The Commonwealth:]     Doctor, I am going to get you . . . to the area that I am most concerned about. You indicated on your report that everything seemed to be normal. Could you tell me a little bit about what we're looking for when you're looking at something in the hymeneal ring?

[Dr. Novinger:]     We're looking for evidence of acute, chronic, or healed trauma in light of the history that we're provided. We know that children – girls who are victimized, the overwhelming majority of their exams will be normal, and that's what we expect to find if it's greater than 72 hours. If it is less than 72 hours – in other words, we see the child less than 72 hours after they've been victimized – then about 70 percent will be normal. And so our expectation . . . is that the exam would be entirely normal.

[The Commonwealth:]     Okay. But when you're going in on an examination based on the disclosure like you had in this case, what is your expectation? Do you think you're going to find something? Is there a red flag that waves around at the hymen as to a huge indicator flashing sign saying this person has been abused?

[Dr. Novinger:]     No. I mean we're objective in trying to -- our goal is to identify and objectively examine and describe what we find. The truth of the matter is that the overwhelming majority of children, adolescent girls, who present with the sort of complaint

|  |  |
|---|---|
|  | that [C.S.] did their exam is normal. |
| [The Commonwealth:] | So is there a certain like watermark that you would think that you would see in patients that presented with this disclosure that [C.S.] had? |
| [Dr. Novinger:] | No. No. I would expect that her exam would be normal. |

N.T. Trial, 1/21/14, at 203-05 (R.R. at 86a-88a). Dr. Novinger went on to explain that the reason that physical evidence is rare is because children who are abused frequently sustain no injuries during, or heal after, the abuse, contrary to long-held cultural beliefs:

|  |  |
|---|---|
| [Dr. Novinger:] | [W]e know that the hymen and the surrounding structures of . . . the vagina is the mucosa, similar to the mucosa that is inside your mouth. We know that this part of the body heals up very quickly should there be an injury. We know that in the event we see a child very early after an incident in which she is sexually assaulted, and there is evidence of trauma, that if you check the same child three weeks later, the trauma is completely healed and there really is no residual finding whatsoever, and over the majority of the time that is the case. So I think there's an idea of a culture belief in virginity, which is really a myth. In other words, in children and in anyone who experiences sexual activity, the idea that they're changed in some way as a result is really a myth. That the overwhelming majority of times they're really not changed in any way. As I show |

there, the hymeneal rim, it's actually . . . not a membrane and therefore it's not something that necessarily is traumatized by penetration. It's made of tissue, which is very elastic. And I mean obviously this is where a baby comes from and the good Lord made that part of the body to stretch. And so we know that adolescents can experience stretching there either as a [result] of sexual assault or even as the result of [a] speculum exam . . . and have no evidence of any trauma.

*Id.* at 205-06 (R.R. at 88a-89a). Doctor Novinger then explained that, because physical examinations typically reveal no physical evidence of abuse, physicians forming expert opinions on whether a child was sexually abused rely largely on the child's provided history, explaining that his experience and a series of medical publications similarly refute the notion that one's "virginity" can be determined by resort to physical examination:

[The Commonwealth:] Doctor, I'm just going to back you up a little bit. You touched upon the fact that you're talking about whether this idea that we have as a society of a virgin, what have you had in your experience and in the medical literature that says that the examination of a person who has had intercourse versus the examination of a person who hasn't had intercourse, how you would be able to differentiate the difference between those two?

[Dr. Novinger:] Really by history only. There is really no physical difference

|  | between the two, and in the context of medical literature today, the term virgin would not be used because it really has no medical basis. The idea that a virgin is someone who has not had the change of someone who had experienced a sexual experience or sexual assault is really a long, long standing myth. It's a cultural belief that [the] medical field just does not support. |
|---|---|
| [The Commonwealth:] | Where do you get this information from when you're talking about the medical literature? |
| [Dr. Novinger:] | Besides my personal experience at the CAC, there's a published peer review in medical literature that at this point universally supports the significant fact that the hymenal ring is typically not changed by any penetration. |
| [The Commonwealth:] | Doctor, when you authored your report . . . with regard to what your findings were with [C.S.], you would expect them to be normal, right? |
| [Dr. Novinger:] | Yes. |
| [The Commonwealth:] | Do you cite this book, Child Abuse, Medical Diagnosis and Management as a reference to say that you would expect that examination to be normal based on her disclosure? |
| [Dr. Novinger:] | Yes. |

| | |
|---|---|
| [The Commonwealth:] | Is this a book that you find to be authoritative and that others in your profession would find authoritative in the area of child abuse? |
| [Dr. Novinger:] | Yes. |
| [The Commonwealth:] | Doctor, is there a specific article that you mentioned in your report . . . that basically describes that whole idea of virgin in the context of medical research? |
| [Dr. Novinger:] | Yes. I have to emphasize there's a number of different articles. There is one particular one in 2004 published by Nancy Kellogg and others in which they examined 36 adolescent girls, all of whom were pregnant. So by definition they have had sexual experience and described their hymenal anatomy, and the overwhelming majority of these pregnant adolescents, hymenal anatomy was completely normal. There was no evidence of acute trauma, blunt trauma, notching, anything like that that you would expect from a belief that somehow they're changed by a sexual experience. . . . Two of the 36 were not normal, and actually one of the 36 had — it was actually her second child. I think there was a belief that somehow the hymen disappears after their first sexual experience, and again, that's a cultural myth that is part of a young woman's anatomy. It doesn't go away. |

> And in most cases it's not changed.

*Id.* at 206-09 (R.R. at 89a-92a).

On cross-examination, Appellee's counsel attempted to characterize Dr. Novinger's testimony as indicating that the medical evidence did not corroborate the Commonwealth's allegations of abuse, but Dr. Novinger rejected the characterization, noting that a portion of the "medical evidence" — C.S.'s medical history — indicated she was abused:

> [Appellee's Counsel:]   Dr. Novinger, you testified at length about this exam. Of course you started the testimony by agreeing that the medical evidence that you observed in this alleged victim did not support an allegation that there was sexual abuse.
>
> [Dr. Novinger:]   The history she provided to me pretty clearly indicated that she was sexually abused.

*Id.* at 218-19 (R.R. at 101a-02a). Appellee's counsel clarified that, by "medical" evidence, he was referring to physical evidence, and, ultimately, asked Dr. Novinger whether he could offer an opinion as to whether C.S. was sexually abused based solely thereon. Dr. Novinger responded that he could not, but that his opinion, based on the forensic medical examination as a whole, was that C.S. had been sexually abused:

> [Appellee's Counsel:]   Based on your physical examination, you can't testify here today to a degree of medical certainty as to whether or not this particular victim was sexually assaulted.

| [Dr. Novinger:] | I really can't speak to the different parts of the medical encounter. [The] [m]edical encounter included a history as well as a physical exam. As I said, the physical exam was normal. Clearly the medical encounter indicated the child had been victimized. |

*Id.* at 228 (R.R. at 111a).

On redirect examination, the Commonwealth sought to emphasize that the lack of physical evidence did not undermine its allegations, and Dr. Novinger agreed, restating his conclusion that C.S. had been sexually abused:

| [The Commonwealth:] | [W]hen you're saying that your examination is normal, you're not saying that nothing happened, are you? |
| [Dr. Novinger:] | That's correct. I really believe strongly that was my medical conclusion that this child was victimized. |

*Id.* at 229 (R.R. at 112a). Notably, Dr. Novinger at no point identified Appellee, or any other specific individual, as the perpetrator of C.S.'s abuse.

Although not objecting at that time, the next day, Appellee's counsel made an oral motion to strike this testimony as "inappropriate opinion testimony that's not based on medical evidence or . . . medical expertise." N.T. Trial, 1/22/14, at 22 (R.R. at 115a). The trial court denied the motion, reasoning that the testimony was an admissible medical opinion, based on the forensic medical examination as a whole, that C.S. had been sexually abused.

Ultimately, Appellee was convicted of the aforementioned offenses and sentenced to a term of 10½ to 30 years imprisonment. He appealed to the Superior

Court, arguing that the trial court erred in denying his motion to strike because Dr. Novinger's testimony, founded solely upon his crediting C.S.'s reports of the abuse, indirectly vouched for C.S.'s credibility and invaded the jury's purview as the sole arbiter of credibility. The Superior Court agreed, reversing and remanding for further proceedings, and the Commonwealth sought allocatur, which we granted.

Before us, the Commonwealth argues, consistent with the trial court's analysis, that Dr. Novinger's testimony did not express an opinion on C.S.'s credibility, but, rather, expressed a medical opinion based on the forensic medical examination as a whole, that C.S. had been sexually abused. The majority rejects the Commonwealth's arguments based on the view, shared by some other jurisdictions, that an expert opinion that an individual was sexually abused, founded solely on the expert's crediting the individual's reports of the abuse, is "inextricably tied to [the expert's] belief in the complainant's veracity" and, thus, constitutes "indirect vouching" for the individual's credibility. Majority Opinion at 8-9. The majority further reasons that, because this Court has previously forbidden "expert testimony concerning general characteristics of sexual assault victims," "[i]t would be incongruous indeed for the Court to now forge a minority pathway on the opposite side of the spectrum by sanctioning the admission of evidence having a more direct bolstering effect specific to the complainant." *Id.* at 11 (citing *Commonwealth v. Balodis*, 747 A.2d 341 (Pa. 2000)).

In my view, the majority's analysis in this regard conflates two distinct categories of expert testimony: expert opinions on the subject of witness credibility, which this Court has held inadmissible, and expert opinions on other subjects *founded* on a witness's prior statements, which are not *ipso facto* inadmissible. Indeed, this Court has not hesitated to reject expert testimony merely corroborating a witness's testimony or offering reasons why a witness (or class of witnesses) is credible. *See Commonwealth*

*v. O'Searo*, 352 A.2d 30 (Pa. 1976) (rejecting expert psychological testimony corroborating a defendant's testimony concerning his lack of malice in shooting his victim); *Commonwealth v. Rounds*, 542 A.2d 997 (Pa. 1988) (rejecting an expert's testimony that she believed a complaining witness); *Commonwealth v. Seese*, 517 A.2d 92 (Pa. 1986) (rejecting expert testimony that prepubescent children do not typically fabricate abuse of being sexually abused because they lack sufficient knowledge of sexual behavior to do so); *Commonwealth v. Dunkle*, 602 A.2d 830 (Pa. 1992) (rejecting expert testimony explaining why child sexual abuse victims may delay reporting their abuse).[2]

However, with respect to the latter category — *i.e.*, expert opinions on other subjects which are merely *founded* upon credited reports of others — we have charted a somewhat different course. In *Rounds*, *supra*, we addressed a defendant's claim that his counsel was ineffective in failing to object to a medical opinion, based solely on the alleged victim's history, that the alleged victim had been sexually abused, on the ground that the expert had failed to state the basis for her opinion. *Rounds*, 542 A.2d at 997-99. Notably, we expressly rejected, albeit in *dicta*, the expert's explicit testimony that she *believed* the alleged victim, as an inadmissible expert opinion on her credibility, *see id.* at 997 n.4 (citing *Seese*, but noting the issue was not raised); however, we did not suggest that her opinion itself was inadmissible because it was based solely on the alleged victim's history. Rather, we appeared to reject the proposition, opining that it was counsel's duty to elicit from the expert that her opinion was rooted solely in the

---

[2] Notably, following *Dunkle*, the General Assembly enacted a provision permitting the introduction of such expert testimony under certain circumstances, provided experts do not opine on the subject of witness credibility. *See* 42 Pa.C.S. § 5920.

alleged victim's statement, and then to challenge the *opinion* as unreliable by challenging the *statement* as unreliable:

> [W]e must conclude that trial counsel was ineffective. There is no reason that can be offered for permitting the damaging opinion of [the expert] to be admitted without the facts upon which it was being considered. How could a jury evaluate the expert opinion without even knowing the facts upon which it was based[?] [The expert] testified that the case history was the single most important factor in reaching her conclusion. If the jury believed that the case history she received was inaccurate or false, surely this would affect the validity of her opinion.

*Id.* at 999.

The majority acknowledges that *Rounds* "may provide some inferential evidence that the Court was then not consciously inclined to disapprove expert witness opinions that abuse has occurred within the contours of the case as it had developed," but nevertheless rejects the import of this passage on the ground that the court offered "no developed reasoning . . . on this subject." Majority Opinion at 13. In my view, the more sound reading of the passage is as embracing the notion advanced by the Commonwealth herein: that expert testimony on a subject other than witness credibility is not transformed into an opinion on the subject of credibility solely because it is founded on a witness's prior statements.

Additionally, in *Commonwealth v. Minerd*, 753 A.2d 225 (Pa. 2000), we considered whether a medical expert's testimony that the absence of physical trauma is nevertheless consistent with the alleged sexual abuse was inadmissible expert testimony as to credibility, ultimately adopting the view that it was proper, even if it tended to support a witness's credibility, in part because the expert did not opine directly as to any witness's credibility. *Id.* at 227-30 ("In this case, [the expert's] testimony was probative of the veracity of [the alleged victims]. However, [she] was neither asked for,

nor did she express, any opinion as to whether the children were telling the truth about being sexually abused."). Admittedly, as the majority highlights, we also noted that the expert's testimony "only explained the significance of the results of the physical examination," and that her opinion was "inconclusive as to whether any abuse had even occurred." *Id.* However, in my view, these distinctions are insignificant: because the expert offered no opinion as to a witness's credibility, it did not invade the jury's province as the sole arbiter of credibility.

Given this distinction between expert opinions *about* credibility and expert opinions on other subjects rooted in the expert's credibility judgments, I am likewise unpersuaded by the majority's reliance on our preclusion, in *Balodis*, of "expert testimony concerning general characteristics of sexual assault victims," as supporting its analysis herein. Majority Opinion at 11. Simply put, the testimony in *Balodis* concerned "the general characteristics of child sexual abuse victims as those traits relate to a failure to promptly report abuse." *Balodis*, 747 A.2d at 343. That is, the testimony was offered to explain why child sexual abuse victims engage in conduct that would otherwise form a basis for attacking their credibility, and was not, like Dr. Novinger's testimony herein, an opinion on another subject which was merely rooted in crediting a witness's prior statements.

Moreover, the majority's apparent view that an expert opinion is inadmissible merely because it is rooted in the expert's assessment of the veracity of third-party statements is itself anomalous, as our Rules of Evidence and numerous decisions of this Court have essentially delegated the question of proper methodology for deriving, and the proper foundation of, expert opinions to the judgment of experts themselves, reflecting this Court's reluctance to substitute its judgment on those methodological questions for those of individuals learned and experienced in their respective

specialized fields. *See* Pa.R.E. 702(c) (requiring that an "expert's methodology" be "generally accepted in the relevant field"); *Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1044-45 (Pa. 2003) (noting that "[o]ne of the primary reasons" for deferring to professional judgments concerning methodology is "its assurance that judges would be guided by scientists when assessing the reliability of a scientific method" and that the rationale applies with greater force over time due to "the ever-increasing complexity of scientific advances"); Pa.R.E. 703 ("If experts in the particular field would reasonably rely on . . . facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."); *cf. Commonwealth v. Thomas*, 282 A.2d 693, 698 (Pa. 1971) (noting that medical experts may testify to opinions based upon "reports of others which are not in evidence, but which the expert customarily relies upon in the practice of his profession").

Indeed, I find myself largely in agreement with the Superior Court's decision in *Commonwealth v. Hernandez*, 615 A.3d 1337 (Pa. Super. 1992), which the Commonwealth relies on in its brief. In that case, a criminal defendant raised a claim that his trial counsel was ineffective in failing to object to a medical expert's testimony that "assuming the truthfulness of the victim's history, the physical facts from a medical examination . . . were consistent with the victim's allegation." *Id.* at 1338. The court rejected the defendant's claim, opining that a medical expert is free to base his opinion on methods and foundational facts or data that are reasonably relied upon in the field of medicine:

> The general rule governing admissibility of expert testimony is that "[e]xpert testimony is permitted only as an aid to the jury when the subject matter is . . . beyond the knowledge or experience of the average layman. Where the issue involves a matter of common knowledge, expert testimony is inadmissible." *Commonwealth v. O'Searo*, 352 A.2d [at 32].

> We are unaware of any precedent that establishes that an expert . . . may not explain the assumptions on which he bases his opinion. . . . [A] medical expert may base his opinion upon facts which are in the record and reports of others which are . . . customarily relied upon in practicing medicine, including the observations of lay persons. It follows that a pediatrician . . . may testify that the physical facts observed and reported by the treating physician were consistent with the allegation . . . set forth in the history of the child. The medical history of a patient is customarily relied upon in practicing medicine. Consequently, it is not error for the expert to testify . . . that his opinion assumes the truthfulness of the history supplied by the victim.

*Id.* at 1343.[3]

Finally, I am concerned that the majority's holding will undermine the admissibility of myriad forms of salutary expert opinion evidence. Indeed, one can readily imagine numerous kinds of appropriate expert opinions, rooted solely in the statements of others, that may now be prohibited. Doctors may be forbidden from testifying concerning their patients' diseases where their diagnoses are made on the basis of patients' or other medical professionals' statements or reports. Psychiatric professionals, whose diagnoses often rely solely on their evaluation of their patients' mental states as evidenced by their verbal statements, may be precluded. These and numerous other experts may be forbidden from offering opinions based on third-parties' statements, even where their professions routinely rely on such statements. In my view,

---

[3] In his brief, Appellee claims that *Hernandez* is distinguishable in that, therein, the expert based his opinion on both physical observations and the victim's history, and testified only that the data was consistent with abuse, rather than offering an affirmative opinion that abuse occurred. However, I do not find those distinctions to alter the appropriate answer to the salient question of whether the prohibition on expert opinions on witness credibility applies to opinions that are on subjects other than witness credibility, but founded in assessments of the credibility of witnesses' prior statements.

the exclusion of such expertise from the courts of this Commonwealth would deprive jurors of guidance they need. Moreover, as observed in *Grady*, *supra*, the ever-increasing complexity of modern life counsels toward greater deference to communities of experts as to the proper foundations of their expert opinions.

Such deprivation is particularly pernicious in the context of prosecutions for child sexual abuse. There is an extremely narrow temporal window for the collection of physical evidence of child sexual abuse like that which was alleged to have occurred in this case, such that the discovery of physical evidence is the exception, rather than the rule. *See*, *e.g.*, Bernd Herrmann, et al., Physical Examination in Child Sexual Abuse: Approaches and Current Evidence, Deutsches Arzteblatt International, 692-703, 700 (2014) (noting that physical examinations "reveal only normal findings in 90-95% of cases"); *id.* at 695 (explaining that "'[n]ormal' does not mean 'nothing happened'" and that "[n]ormal findings are the rule, not the exception, in victims of child sexual abuse, with or without penetration").[4] That narrow window almost always closes before a child has time to cognitively and emotionally process his or her abuse – much less overcome the all-too-frequent confusion, embarrassment, guilt, and shame that accompany it – and to report it to anyone, including medical professionals. Moreover, medical professionals are comfortable and experienced in arriving at a diagnosis without physical evidence, and the absence of such evidence is often given too great of weight, outside of the medical profession, based on outdated cultural myths about virginity. *See also id.* at 700 (noting that "[t]he diagnosis of sexual abuse is usually based on a

---

[4] Notably, Dr. Novinger testified that, even if a child victimized in the manner C.S. was allegedly victimized does manage to comprehend and report his or her victimization within a mere three days, medical professionals still expect an absence of physical evidence in approximately 70 percent of cases. N.T. Trial, 1/21/14, at 204 (R.R. at 87a).

statement from the child, obtained in the correct way through sympathetic but not suggestive questioning"); *id.* at 695 (explaining that "[t]he medically documented fact that penetrating abuse may not be associated with any subsequently abnormal physical findings must be known and understood by the treating personnel and the government authorities . . . so that the credibility of the victims will not be unjustly put in doubt"). Against this backdrop, I am troubled that the majority's departure from ordinary principles governing expert opinion foundation may only serve to deprive jurors of necessary expert determinations, demanding more than medical science requires and insisting on more than is present in all but a few cases of child sexual assault, where jurors are most in need of specialized knowledge on the subject.

I acknowledge that expert opinions based in whole or in part on assessments of the credibility of particular witnesses could conceivably tempt jurors to view those witnesses as credible. However, I do not view this concern as a sufficient reason to conclude that such expert opinions are, in and of themselves, opinions on witness credibility, nor do I think they unavoidably invite the jury to abdicate its role as the arbiter of credibility. Notably, litigants concerned that expert opinions are rooted in dubious credibility assessments are free, for example, to challenge those opinions as methodologically inappropriate in the expert's field of expertise. *See* Pa.R.E. 702(c). Moreover, litigants may argue that such opinions are more unfairly prejudicial than probative of the facts at issue. *See* Pa.R.E. 403. Additionally, litigants may take the course charted in *Rounds*: vigorous cross-examination with regard to an opinion's foundational components and argument to the finder of fact concerning the reliability of those components themselves. Indeed, as we indicated in *Rounds*, the persuasive value of an expert opinion demonstrably shown to rely solely on a hearsay account will, if properly explained to a jury, rise and fall with the persuasive value of that hearsay

account.  *See Rounds*, 542 A.2d at 999 ("If the jury believed that the case history [the expert] received was inaccurate or false, surely this would affect the validity of her opinion.").  Appellee availed himself of none of these options.[5]

Thus, I would hold that the prohibition of expert testimony on credibility does not preclude expert opinions which do not opine as to a witness's credibility, but which address other subjects and are necessarily based on an expert's assessment of that credibility.  Applying that rule herein, Dr. Novinger's testimony that he "believe[d] strongly that was [his] medical conclusion that [C.S.] was victimized" was properly admitted.  Dr. Novinger's testimony, although based on C.S.'s history, contains no express opinion that C.S. was credible or incredible, or that children like C.S. are generally credible or incredible.  Moreover, Dr. Novinger's testimony was not challenged on the basis that his opinion was rooted in methods or statements not customarily relied upon in the fields of pediatrics or child abuse, and, at no time did he testify on subjects irrelevant to his medical inquiry, such as whether Appellee was the perpetrator of the abuse.  Indeed, Dr. Novinger, offered by the Commonwealth and certified by the trial court as an expert in the fields of pediatrics and child abuse, merely testified to his view, based on his expertise in those fields, that C.S. had been sexually abused.  In my view, and contrary to the conclusion of the majority, our decisions emphasizing the jury's role as arbiter of credibility do not bar such testimony.  Accordingly, I would hold that Appellee was not entitled to strike the testimony, and that the learned trial court did not

---

[5] I also note that a party is entitled to a cautionary instruction that such testimony is meant to establish the opinion's foundation, and is not substantive evidence.  *See* Pa.R.E. 705 cmt. ("When an expert testifies about the underlying facts and data that support the expert's opinion and the evidence would be otherwise inadmissible, the trial judge upon request must, or on the judge's own initiative may, instruct the jury to consider the facts and data only to explain the basis for the expert's opinion, and not as substantive evidence.").

err in denying Appellee's motion to do so, and thus, I would reverse the Superior Court's order and reinstate Appellee's convictions and judgment of sentence.